Charles Luther McCLAIN, Appellant,

v.

Dianne Pruitt McCLAIN, Appellee.

No. S–900.

Supreme Court of Alaska.

April 4, 1986.

**382**

Harry Branson, Branson, Bazeley & Chisolm, Anchorage, for appellant.

Dianne P. McClain, in pro. per.

Before RABINOWITZ, C.J., and BURKE, MATTHEWS, COMPTON and MOORE, JJ.

## OPINION

RABINOWITZ, Chief Justice.

Charles McClain appeals the order of the superior court granting Charles and his ex-wife joint custody of their child. The court based its order in part on an agreement executed by both parents and subsequently renounced by Charles.

*Facts.*

At the center of the controversy is an agreement signed by Dianne and Charles McClain ("Dianne" and "Charles") regarding custody of their adopted minor child, Wendy (d.o.b. December 16, 1980).

Dianne filed for divorce from Charles on December 20, 1982. In their pleadings, both Dianne and Charles sought sole custody of Wendy. On April 15, 1983, the parties signed a custody agreement, stipulating that they would have joint custody of Wendy; Dianne would have custody from September through May, and Charles would have custody from June through August each year. They also agreed to alternate custody at Christmas, and allocated child support, life and medical insurance, travel, and travel costs. They agreed to advise each other of the physical, mental, and emotional condition of Wendy, and to permit her to speak to the noncustodial parent by telephone.

The case was referred to Elizabeth Southworth of the Custody Investigators Office so that she could review the custody agreement. Southworth met with both parents that month. She found that Dianne planned to move to South Carolina, where her family lived, on May 1, 1983. Charles told her that he had agreed to joint custody only to get Dianne out of the state, and that he intended to file for sole custody as soon as the divorce was granted. He stated that Dianne had an extensive history of mental illness and was unstable and unfit to care for Wendy. Thereafter, Southworth held an attorney conference and advised counsel for both parties that she would not recommend joint custody based on what Charles had told her.

Charles made an appointment to see Southworth, and told her that he had "mellowed out" and felt comfortable with the terms of the agreement. He also stated that he had discussed the possibility of filing for sole custody with his attorney and had decided to abide by the joint custody agreement.

Southworth's report to the standing master, Cindy McBurney, stated that:

> Mr. McClain's credibility with me is shakey (sic) at best. He originally made some very definite and hard felt statements regarding his wife's ability to care for their child and in his second interview with me he gave me no indication as to what might have occurred in the intervening time to cause him to change his opinion. It is my feeling that Mr. McClain (sic) statements in the second interview were merely to smooth out the divorce process. I am not prepared to make any recommendation regarding custody in this matter at this time.

Master McBurney referred Dianne and Charles back to Southworth for a new investigation. Charles again told Southworth that he intended to pursue sole custody. As a result of Charles' claims that Dianne had an extensive history of mental illness and was unfit to care for Wendy on a long-term basis, Southworth referred the

McClains to Dr. Richard Enter for psychological evaluations.

Dr. Enter noted in his report that Dianne and Charles were at the time meeting, discussing child care, and maintaining "an unusually compatible relationship given their legal dispute over custody." He interviewed and tested both parents. In his report he described the personalities of both individuals and their relationships with Wendy. In summary, he found that either parent certainly could provide for the care and welfare of the child and that both enjoyed a good relationship with her and displayed concern for her future. He did not think that joint custody was desirable, however, since Dianne planned to live so far away from Charles.

After Dr. Enter issued his report, Southworth again was informed that Charles and Dianne were attempting to reach a joint custody agreement. Southworth did not know that Charles intended to litigate custody until Dianne's attorney notified her of the impending trial. In her final report to the court Southworth stated that she did not disagree with Enter's findings, but that she could not wholeheartedly endorse his recommendation that Charles be given sole custody if the parties were unable to exercise a satisfactory joint custody agreement, because of Charles' lack of credibility throughout the entire investigation:

> There is no doubt in this Investigator's mind that both Mr. and Mrs. McClain love their child deeply. Neither can be considered unfit as parents. It is clear that there are major differences in each parent's lifestyles [and] beliefs, but this Investigator does not believe that one is clearly superior to the other.

Southworth declined to make a final recommendation as to custody, however, since she had not had sufficient notice before trial to complete her investigation.

The superior court granted the parents joint custody pursuant to the agreement they had signed on April 15, 1983. The court stated in its findings of fact that both Dianne and Charles were represented by counsel when they executed the agreement. The court found that Dianne had intended to fully comply with the agreement and that Charles had intended to litigate the agreement once Dianne left Alaska. The superior court further found that Charles might have misunderstood the advice of his attorney. Additionally the court stated that from the date of the executed agreement until the trial there was no substantial change of circumstances, and that there was no legal or equitable reason not to require Charles to honor the agreement.

In its conclusions of law, the superior court stated that both parents were fit and proper persons for custody of Wendy, and that the April 15, 1983 agreement met the best interests of the child and should be adopted as the court's final order regarding custody and child support.

This appeal followed.

*Determination of the Best Interests of the Child.*

Charles contends that the trial court ignored its statutory obligation under AS 25.-20.060 and AS 25.24.150(c) to award custody based on the best interest of the child.[1] He maintains that it is unclear whether the trial court applied the statutory factors in making its determination.

---

1. AS 25.20.060 states in part:
 The court shall award custody on the basis of the best interests of the child. In determining the best interests of the child, the court shall consider all relevant factors including those factors enumerated in AS 25.24.150(c).
 The factors enumerated in AS 25.24.150(c) are:
 (1) the physical, emotional, mental, religious, and social needs of the child;
 (2) the capability and desire of each parent to meet these needs;
 (3) the child's preference if the child is of sufficient age and capacity to form a preference;
 (4) the love and affection existing between the child and each parent;
 (5) the length of time the child has lived in a stable, satisfactory environment and the desirability of maintaining continuity;
 (6) the desire and ability of each parent to allow an open and loving frequent relationship between the child and the other parent.

While the superior court did not specifically address the factors in AS 25.24.150(c), it did consider the best interests of the child. The court found that both parties were fit and proper persons for the custody of Wendy. The court also concluded that the child custody agreement should be adopted as the final custody order because it met the best interests of the child.

■ We will reverse a trial court's resolution of a custody issue only if we are convinced that the record shows an abuse of discretion or if controlling factual findings are clearly erroneous. *Gratrix v. Gratrix*, 652 P.2d 76, 79–80 (Alaska 1982). Abuse of discretion is established if the trial court considered improper factors or failed to consider statutorily-mandated factors, or improperly weighed certain factors in making its determination. *Id.* at 80.

There are two lines of cases that speak to whether the trial court's failure to specifically address the relevant factors mandates remand or reversal. On one hand, we found remand or reversal necessary in *Gratrix v. Gratrix*, 652 P.2d 76 (Alaska 1982), and in *Headlough v. Headlough*, 639 P.2d 1010 (Alaska 1982). In *Gratrix*, the father was awarded custody of his daughter after seeking modification of an earlier award of custody to the child's mother. The mother appealed the modification, contending that the trial court had not given proper deference to the findings and decision made at the initial custody determination. 652 P.2d at 81. We reversed, holding that given the absence of any discussion of the specific findings made in the prior custody determination, the superior court failed to accord proper deference to the initial custody decision. *Id.* at 82. In *Headlough*, the mother, who had been awarded custody of her children, sought a modification of the divorce decree to increase the amount of child support from the father. The trial court granted the increase, and the father appealed, arguing that the court abused its discretion. 639 P.2d at 1014. We remanded, holding that on the record we could not determine whether there was an abuse of discretion because the trial court did not explain through findings of fact why it modified its original order.

In the second line of cases, we have found that the trial court's failure to state its findings is not fatal to the case. In *Harding v. Harding*, 377 P.2d 378 (Alaska 1962), the superior court granted custody of a couple's children to their father, noting that the mother was not entitled to the children under the tender years doctrine because the rule was contingent upon "other things being equal." *Id.* at 379–80. The court found that everything else was not equal. On appeal we stated:

It would have been helpful to this court if [the trial judge] had listed the subsidiary facts upon which he based his general finding that "everything else is not equal" and which impelled him to award the custody of the two older children to the father, *but his failure to do so is not fatal to this case.* He did state that their education would be best served by placing them in the custody of the father. In spite of the wife's insistence to the contrary *we have no difficulty in gleaning other factors from the record in support of the trial judge's general finding.*

*Id.* at 380 (emphasis added, footnote omitted).

In *Mullaly v. Mullaly*, 518 P.2d 1395 (Alaska 1974), a husband appealed the trial court's property division in conjunction with a divorce decree as unjust. *Id.* at 1397. The trial court, in determining how to divide property, was to consider eight different factors, such as the ages and earning abilities of the parties. *Id.* We held that the entire record should be examined in order to obtain an understanding of the basis for the trial court's decision. *Id.* We found ample evidence in the record indicating that the trial court conscientiously considered and applied the relevant factors in reaching the property disposition; therefore we found no abuse of discretion. *Id.* at 1398.

▮ This case falls into the second line of cases. The first line of cases consists of appeals from custody modifications. In actions for modifications of custody, the trial court must give great weight or due deference to the original custody determination. *Gratrix*, 652 P.2d at 81. In a sense, the trial court is reviewing the initial decision; it cannot redetermine facts which might have subsequently changed and must depend on the findings from the original trial for purposes of comparison. Without the trial court's specific discussion of the previous findings, we have no way of knowing whether the trial court exceeded the scope of its determination by reweighing the evidence.

In an initial custody proceeding, however, the trial court is the finder of fact and is free to consider many factors, such as the demeanor of the witnesses and conflicting testimony. AS 25.20.060 states that in determining the best interests of the child, the court shall consider *all relevant factors including* those enumerated in AS 25.24.150(c). Applying the standards of *Harding* and *Mullaly*, we find that the trial court did not abuse its discretion, as the record supports the trial court's finding that the terms of the agreement were in Wendy's best interest.

*Proper Consideration of the Custody Agreement.*

Charles contends that the superior court erred in considering the custody agreement as a factor in determining custody. The superior court stated in its findings of fact that "[t]here is no legal reason nor any equitable reason not to require defendant to honor this agreement."

▮ AS 25.20.090 lists the factors that the trial court should consider in determining whether to award shared custody of a child.[2] The statute allows the court to consider those factors which "it considers pertinent." AS 25.20.090(9). The custody agreement is a pertinent factor because it demonstrates that cooperation between the parents is possible. However, the agreement has no binding force on the court. The contractual intent of the parties is irrelevant. The court must independently determine what arrangement will best serve the child's interests.

The danger present if a trial court bases a custody decision solely on a repudiated custody agreement is that such a decision would not necessarily honor the best interests of the child. Trial courts, not parents, are the ultimate decision makers as to custody and are not bound by private agreements. A child is not a chattel to be bargained away for consideration. Courts have sometimes refused to be bound by custody stipulations even when both parties stand by their agreement. *See, e.g., In Re Marriage of Hanson*, 112 Ill.App.3d 564, 68 Ill.Dec. 268, 445 N.E.2d 912 (1983) (parents' agreement that best interests of the child would be served by joint custody rejected by court). When parents fail to come to an agreement or change their

---

2. AS 25.20.090 states:
 *Factors for consideration in awarding shared child custody.* In determining whether to award shared custody of a child the court shall consider
 (1) the child's preference if the child is of sufficient age and capacity to form a preference;
 (2) the needs of the child;
 (3) the stability of the home environment likely to be offered by each parent;
 (4) the education of the child;
 (5) the advantages of keeping the child in the community where the child presently resides;
 (6) the optimal time for the child to spend with each parent considering
 (A) the actual time spent with each parent;
 (B) the proximity of each parent to the other and to the school in which the child is enrolled;
 (C) the feasibility of travel between the parents;
 (D) special needs unique to the child that may be better met by one parent than the other;
 (E) which parent is more likely to encourage frequent and continuing contact with the other parent;
 (7) any findings and recommendations of a neutral mediator;
 (8) whether there is a history of violence between the parents;
 (9) other factors the court considers pertinent.

minds about a stipulation, this may indicate a lack of the cooperation necessary for joint custody to be successful. The most ardent proponents of joint custody assume cooperation between parents and agreement about child rearing practices as basic requirements for joint custody. *In Re Marriage of Neal*, 92 Cal.App.3d 834, 155 Cal.Rptr. 157, 162 (1979); *In Re Marriage of Burham*, 283 N.W.2d 269, 275 (Iowa 1979); *Dodd v. Dodd*, 93 Misc.2d 641, 403 N.Y.S.2d 401, 405 (N.Y.Sup.1978); Foster & Freed, *Joint Custody: A Viable Alternative*, 15 Trial 26, 31 (1979).

Alaska's shared custody statute does not require that both parents agree to joint custody. AS 25.20.060;[3] AS 25.20.090. We think it apparent, however, that cooperation between parents is essential if the arrangement is to be in the best interests of the child. *See Smith v. Smith*, 673 P.2d 282, 283 (Alaska 1983) (superior court's rejection of joint custody upheld where based on finding that the parties would not be able to cooperate in making decisions regarding their child). This does not mean that a parent can frustrate joint custody by repudiating an agreement previously reached in cooperation with his or her spouse. In this respect we agree with the approach of the court in *People ex rel. Wasserberger v. Wasserberger*, 42 A.D.2d 93, 345 N.Y.S.2d 46 (N.Y.App.1973), *aff'd*, 34 N.Y.2d 660, 355 N.Y.S.2d 580, 311 N.E.2d 651 (1974). In *Wasserberger*, the parties executed an agreement for joint custody of their children providing that the children could share and have the benefit of the love, counsel, and attention of both parents. The parties freely entered into the agreement and fully understood its contents and implications. *Id.* 345 N.Y.S.2d at

48. The children's mother then petitioned for sole custody. The court held that no custody agreement could bind the court so as to render inoperable its supervisory power; when a court recognizes or gives attention to an agreement, it does so not because the parties' compact binds the court, but for the light it sheds on the motives and dispositions of the parties. *Id.* The court looks at the total picture and attempts to consider and weigh all factors in determining what is in the best interests of the child. *Id.* The *Wasserberger* court found that the petitioner, having consented to the custody arrangement, had shown nothing to warrant a change. *Id.* at 49.

■ Our review of the record persuades us that the superior court applied the proper analysis. The custody agreement, even though later repudiated by Charles, indicates that the parties are able to cooperate for Wendy's sake. Almost all of the evidence presented at the hearing supports findings that both parents are capable of meeting Wendy's needs, that both parents enjoy a loving and affectionate relationship with her, that Wendy will live in a stable, satisfactory environment with either parent, and that both parents are reasonable and respectful enough to adhere to a joint custody award. Therefore, the superior court did not abuse its discretion in enforcing the custody agreement.

*Proper Consideration of the "Change of Circumstances" Doctrine.*

■ Charles also contends that the superior court erred in applying the "change of circumstances" doctrine to the custody agreement, since the court had not previ-

---

**3.** AS 25.20.060 states:

*Custody of a child.* (a) If there is a dispute over child custody, either parent may petition the superior court for resolution of the matter under AS 25.20.060–25.20.130. The court shall award custody on the basis of the best interests of the child. In determining the best interests of the child, the court shall consider all relevant factors including those factors enumerated in AS 25.24.150(c).

(b) Neither parent, regardless of the question of the child's legitimacy, is entitled to preference in the awarding of custody.

(c) The court may award shared custody to both parents if shared custody is determined by the court to be in the best interests of the child. An award of shared custody shall assure that the child has frequent and continuing contact with each parent to the maximum extent possible.

ously adopted the agreement. The change of circumstances doctrine states that a court will not modify a custody determination unless there has been a substantial change of circumstances that renders a change in custody in the best interests of the child. *Nichols v. Nichols*, 516 P.2d 732, 735 (Alaska 1973). This doctrine usually applies when the trial court has previously entered a judgment in a custody dispute. Here the superior court decided to enforce the parties' prior agreement since it found no reason not to do so, and found that "[f]rom the date of the executed agreement until the trial there was no real substantial change of circumstances."

Since the court should have been evaluating Wendy's best interests as of the time of trial, there was no point in considering the change of circumstances doctrine. However, we conclude that the superior court's reference to the change of circumstances doctrine constituted harmless error, since the court concluded that the agreement was in the best interests of the child at the time of trial.

*The Superior Court's Award of Principal Physical Custody to Dianne.*

 Finally, Charles argues that the superior court abused its discretion in awarding principal physical custody to Dianne. We do not agree. The record shows that both Charles and Dianne are capable, loving, and responsible parents. While Dr. Enter testified that if he had to choose one parent over another, he would choose Charles, he considered both parents to be fit and proper and approved of shared custody. Southworth declined to make any recommendation as to custody, but had problems with Charles' credibility.

The evidence at trial was clear that both Charles and Dianne are very good parents and that Wendy's best interests will be served by the shared custody arrangement adopted by the superior court.

The superior court judgment is AFFIRMED.