Joshua HAVEL, Appellant,

v.

Eppie HAVEL n/k/a Hogan, Appellee.

No. S–13075.

Supreme Court of Alaska.

Sept. 18, 2009.

Carl D. Cook, Law Office of Carl D. Cook, P.C., Anchorage, for Appellant.

Cris W. Rogers, Law Office of Cris W. Rogers, Anchorage, for Appellee.

Before: FABE, Chief Justice, EASTAUGH, CARPENETI, WINFREE, and CHRISTEN Justices.

OPINION

CARPENETI, Justice.

## I. INTRODUCTION

Divorced parents originally agreed to joint physical custody—split fifty-fifty—of their son and to negotiate each month's schedule based on the parties' work schedules. The mother later moved to set a specific schedule, on the grounds that communication was deteriorating, and that inconsistency in scheduling and occasional long separations from each parent were not in their son's best interest. The superior court set a schedule that resulted in a permanent change in the amount of time each parent would spend with the child. The father appeals, arguing that it was error to set a specific schedule because no change in circumstances occurred, and that the superior court erred in setting a schedule that significantly reduced his time with the child. We conclude that no change in circumstances was required to set a schedule because it is not a modification to set a schedule where the parties did not previously have any schedule. We also conclude that it was not error to find that setting a specific schedule was in the child's best interest. However, because the change in the agreed-to division of time with the child amounted to a modification of custody, we reverse the superior court's order and remand for further proceedings to set a schedule consistent with the parties' agreement to split custody fifty-fifty.

## II. FACTS AND PROCEEDINGS

### A. Facts

Eppie Havel (n/k/a Hogan) and Joshua Havel are parents to a son, born in 1999. Eppie and Joshua divorced in April 2006 and since then have maintained joint legal and physical custody of their son. Until entry of the court order setting a specific schedule that is the subject of this appeal, the parties attempted to set each month's custody schedule via e-mail based on their work schedules, in accordance with their separation agreement. Eppie is employed as an independent contractor for British Petroleum with a thirty-two hour per week schedule, and with

flexibility in when she works. Joshua is a flight engineer for Lynden Air Cargo whose monthly schedule is determined through a bid packet system. This means that he bids for his desired schedule each month, but because the system is based on seniority and he has low seniority, he does not always get his desired schedule.

In January 2007 and August 2007 the parties experienced substantial difficulty working out a suitable schedule, and returned to court as a result. Over the course of time, Eppie became "very stressed" by communication needed each month to set the schedule for the following month and became convinced that she and her son would be better off with a set schedule to create a sense of "stability and expectability."

### B. Proceedings

The superior court incorporated the parties' custody agreement into its divorce order in April 2006. The physical custody and "custody schedule" provision provided that:

> The parties shall be awarded equal (50/50), shared physical custody of their son. Each month's custody schedule shall be worked out between the parties by the 15th day of the preceding month, based upon the parties' work schedules. Both parties recognize and acknowledge that both of their respective work schedules require flexibility in exercising custody of their child, and shall work together with this understanding.

In January 2007 Joshua brought a motion to enforce the custody agreement to allow him to have his son February 1–15, 2007. Superior Court Judge Sen K. Tan denied the motion with respect to the request for specific dates, noting that there was no mechanism in the parties' agreement for resolving physical custody issues when the parties were unable to reach agreement. The superior court interpreted the agreement to require equal custody over the course of time, but not in a given month. The court ordered that the parties meet together with attorneys

to work out a February schedule, which they did.

In September 2007 Eppie filed a motion for a specific schedule. She stated that she was not asking the court to modify custody, but indicated that the agreement to negotiate a schedule each month had become unworkable because (1) the schedule usually was built only around Joshua's schedule; (2) he was increasingly unwilling to accept any schedule that was not built around his schedule, regardless of the resulting time the child would be separate from one parent, and as a result the parties' ability to work together and their communications were deteriorating; and (3) the child was showing signs of stress, and it would be in his best interest to have some routine and structure in the schedule.

The dispute went to a hearing before Superior Court Master Jonathon Lack, who found that the agreement required "a high ability of the parties to communicate in a meaningful and productive manner without conflict," that the arrangement was causing stress to Eppie and "may be problematic for the child," and that there had been a breakdown in communication constituting a change in circumstances. The master found that, in spite of the order, the child was doing well, but that the stress placed on Eppie and the arrangement, overall, had a substantial probability of negatively affecting the boy as he grew older. Accordingly, the master recommended a new schedule that gives Eppie custody from the beginning of each month through the third Friday of each month, and Joshua custody from the third Friday through the last day of the month. The superior court approved the master's recommendation. Joshua moved for reconsideration, pointing out that the new schedule would lead to a significant reduction in his custodial time. The superior court denied reconsideration. Joshua appeals.

### III. STANDARD OF REVIEW

 We review a trial court's decision to establish a custody schedule for abuse of discretion.[1] We reverse a trial court's order to modify custody only if "the record shows an abuse of discretion or if controlling factual

1. *Cusack v. Cusack,* 202 P.3d 1156, 1162 (Alaska 2009); *Siekawitch v. Siekawitch,* 956 P.2d 447, 451 n. 7 (Alaska 1998).

findings are clearly erroneous."[2] Abuse of discretion may occur when the trial court "considers improper factors, fails to consider statutorily mandated factors, or gives too much weight to some factors."[3] A factual finding is clearly erroneous if, after reviewing the record as a whole, we are left with a definite and firm conviction that a mistake has been made.[4]

## IV. DISCUSSION

■ Joshua argues that the trial court erred because it modified custody although the evidence did not support a finding of substantial change in circumstances. We analyze two different results of the trial court's order to evaluate whether a modification requiring a showing of a change in circumstances occurred. First, we review the action of setting a schedule. Next, we review the specific schedule the court set to determine whether it results in a modification of the custody arrangement. By "custody arrangement," we mean the overall percentage of time each parent has custody of the child.[5]

### A. It Was Not an Abuse of Discretion To Set a Specific Custody Schedule.

■ Joshua argues that, in setting out a specific schedule, the superior court impermissibly modified the custody arrangement. He argues that this was error because there was no change in circumstances that justified it. Eppie responds that the motion to set a schedule did not seek modification of custody or visitation triggering the application of AS 25.20.110, the statute governing changes of custody or visitation, and the case law interpreting that statute.[6] In *Siekawitch v. Siekawitch*,[7] we analyzed a situation in which the parties agreed in their petition for dissolution "to amicably decide in the future on reasonable visitation times."[8] In that case, the father was granted physical custody, but we noted that "had the dissolution form reflected an agreement by the parties to joint physical custody, their dispute would merely be over *establishing* visitation rather than *modifying* custody. In such a case, no change of circumstances would be necessary."[9]

Here, the parties' original provision for a schedule is quite similar to the provision at issue in *Siekawitch* in that the parties agreed to agree on a schedule in the future. In essence, the parties' agreement to agree each month, based on what is convenient for their work schedules, is not meaningfully different than the Siekawitchs' agreement to amicably decide in the future. We therefore conclude that the parties did not have a schedule and that setting a schedule was not a modification. Had the schedule conformed to the parties' plan for a fifty-fifty split in custody, it would not require a showing of changed circumstances.

### B. The Superior Court Did Not Abuse Its Discretion in Establishing a Specific Schedule.

■ Joshua challenges the superior court's decision to impose a specific visitation

2. *Long v. Long*, 816 P.2d 145, 150 (Alaska 1991) (quoting *McClain v. McClain*, 716 P.2d 381, 384 (Alaska 1986)).

3. *Id.* (citing *S.N.E. v. R.L.B.*, 699 P.2d 875, 878 (Alaska 1985)).

4. *Jenkins v. Handel*, 10 P.3d 586, 589 (Alaska 2000).

5. *See, e.g.*, *Siekawitch*, 956 P.2d at 450 n. 6.

6. As 25.20.110 provides in relevant part

(a) An award of custody of a child or visitation with the child may be modified if the court determines that a change in circumstances requires the modification of the award and the modification is in the best interests of the child. If a parent opposes the modification of the award ... and the modification is granted, the court shall enter on the record its reason for the modification.

Both before and after the adoption of the statute, we have required that the moving parent demonstrate a substantial change in circumstances for a modification of custody. *See Jenkins*, 10 P.3d at 589; *Garding v. Garding*, 767 P.2d 183, 185 (Alaska 1989) (holding that the change under the statute must be "significant" or "substantial"). However, if the order modifies visitation only, but not custody, the change "need not rise to the level sufficient to warrant a change in custody." *Acevedo v. Liberty*, 956 P.2d 455, 457 (Alaska 1998) (quoting *Hermosillo v. Hermosillo*, 797 P.2d 1206, 1209 (Alaska 1990)).

7. 956 P.2d 447 (Alaska 1998).

8. *Id.* at 451.

9. *Id.* at 451 n. 7.

schedule rather than leaving the parties to work out, on a monthly basis, the schedule for the following month. But our law is clear that, when parents who have obtained a flexible order cannot agree on the schedule in practice, it is always appropriate for the court to establish a fixed schedule.[10] The concept of the parents "agreeing to agree" on a monthly basis is an attractive one. And, where they can actually negotiate a flexible schedule on a regular basis, it is often best for all concerned. But where they prove in practice unable to agree on a continuing basis on the following month's actual schedule, as happened here, the trial court has the authority to establish a fixed schedule.

Joshua does not address this issue directly. Rather, he argues that the evidence clearly established that the child did very well under the original arrangement and that it was improper to conclude, without evidence, that Eppie's "frustration" with the agreement would adversely impact the child in the future. Because he believes setting a specific schedule effected a modification, he also urges us to apply the rule in *Long v. Long*[11] that any problems the parties experienced in their communications could justify altering custody only if they were found to have resulted in an "extreme" adverse impact[12] on the child. Eppie correctly responds that this rule—that extreme adverse impact on the children must be shown to find that hostility is a change in circumstances—does not apply here. She argues that since—unlike in *Long*[13]—this is not a modification in the parties' joint physical custody arrangement, no

such finding was necessary. She also argues that the trial court's finding that an irregular schedule with long periods of time away from each parent "cannot be good for" their child was correct and should not be disturbed.[14]

The evidence demonstrated that the parties were unable to agree here. They only communicated via e-mail because their ability to speak directly to each other had deteriorated. The parties' ability to communicate effectively had so deteriorated that twice within an eight-month period they had resorted to the court to resolve their disputes. And even when they did manage to set a schedule for the following month, Eppie testified that often their conversations were stressful and frequently did not result in a schedule that was best for the child, since sometimes he had to spend three weeks or even a month away from one of his parents. Thus, as noted above, because the parents were unable to agree on the schedule, the court as always had the authority to establish a specific schedule.

### C. It Was an Abuse of Discretion To Adopt a Sixty–Forty Custody Schedule Where the Parties Continued To Agree that Fifty–Fifty Custody Was in the Child's Best Interests.

 Joshua argues that the current schedule provides him substantially unequal time with his son. As a result, he argues the master's order modified the parties' original custody agreement. Eppie responds that the arrangement for physical custody has not

**10.** *See id.* at 451 (holding that inability of parties to agree on visitation schedule warranted superior court's intervention).

**11.** 816 P.2d 145 (Alaska 1991).

**12.** *Id.* at 152.

**13.** *Long* concerned a very significant modification from sole custody by one parent to sole custody by the other parent. *Id.* at 148.

**14.** In this regard, the parties submitted extensive, and conflicting, evidence about the effect on their son of the parents' disputes over the schedule. Eppie filed affidavits in the superior court claiming that the boy was experiencing symptoms of stress such as migraine headaches and

increased colds. Joshua countered that his medical records showed no signs of these ailments. Eppie did not present additional evidence concerning the boy's medical problems or stress at the hearing. Instead, her testimony about his welfare primarily concerned his interests in seeing each parent regularly and without long, unpredictable separations, testifying that he became upset during long periods away and did better with transitions when the parties had a week-on/week-off arrangement. Joshua responded with extensive testimony from witnesses that the boy was doing very well. The master's report did not make findings regarding these claims, rather finding that although the child was doing well, he was doing well despite the current custody and visitation order. He concluded that the arrangement had a "substantial probability" of negatively affecting the boy as he grew older.

been altered because the new set schedule "best manifests the parties['] agreement to share 50/50 physical custody" in light of the parties' work schedules and other evidence.

Although the master's report to the superior court noted that the new schedule resulted in Eppie having fifty-six percent custody and Joshua having forty-four percent for the remainder of 2008, the master did not calculate the long term effect on each parent's portion of time with the child. In fact, the custody split for 2009 would result in a sixty-forty split.[15] The superior court did not explain whether, or why, it was infeasible to divide time with the child more equally. It appears that the master found that Joshua could either work the first half of the month or work a morning schedule, so the schedule set by the master does not explain the need for this length of separation. The master did note that "both parents indicated a preference to limit midweek transfers," but this is not a justification for such a large change in custody of the child from the equal sharing of custody that the parties bargained for.[16]

The court made no explicit finding that it was in the child's best interest to reduce his time with his father by so much, including several separations of almost three weeks.[17] The court did not explain why providing Joshua with only the third Friday through the end of the month was in the child's best interest. The court could have structured a virtually fifty-fifty division by choosing any five months during the year and providing, for those months, that the transfer would take place on the second, rather than the third, Friday of that month. Even accepting that the parents' expressed desire to avoid midweek transfers is in the child's best interest, we conclude that it was an abuse of discretion not to consider whether another schedule might better meet this goal while

also preserving his equal time with both parents.

The master also explained that the schedule was intended to account for Joshua's work schedule. The evidence regarding Joshua's work schedule does not clearly support the conclusion that the significant deviation from a fifty-fifty split was necessary. Joshua's schedule each month is set by a bidding process based on seniority. The master found that "[a] review of the father's line bid schedule leads the court to believe he can bid and hold a line which would have him flying the first part of the month, or in the alternative, flying instate where he would be home every evening."

At the hearing, Joshua testified regarding the process of bidding for schedules. He said that it begins when the crew scheduler e-mails a bid packet with a memo explaining flight schedules and plans for the following month. When Joshua was asked if he typically got his first or second choice schedule, he said he needed to explain some "quirks" and stated, apparently, that crew members who live in Alaska generally get in-state assignments:

> [W]e have several of our crewmembers, a lot live in Anchorage and in Alaska and a lot of them live in the Lower 48 and they don't—they don't allow the guys in the Lower 48 to bid Anchorage lines for airfare just for—as a cost—saving function when they have guys in state that they've hired.... So because of that I typically get—I don't—I—you know, I never really get my first choice but I—in 2007 ... for 2007 anyways, I managed to stay in state flying in one form or another, whether it'd be *ad hoc*, a.m.'s or p.m.'s or reserve but that's not to say that it will be that this month or next month.

He testified that Lynden had no week-on, week-off schedules. At the end of the hear-

---

**15.** For 2009, under the new schedule, Eppie would have 217 days of visitation—59.5 percent of the year. We treat the new schedule as establishing a sixty-forty custody split between the parties.

**16.** While sixty percent custody is not primary custody, it is substantially more than fifty-fifty. We have never held that joint custody requires a fifty-fifty sharing of time, but here the parties clearly stated in their agreement that the division of custody would be fifty-fifty.

**17.** For example, in August 2009, the schedule would result in twenty days' separation. In March, April, and November 2009, the schedule would result in nineteen days separation. *See also supra* note 15, calculating percentages of time.

ing, the court said, "[a]s I understand it based on your seniority, essentially, the two options that—well the three options that you're going to get on flying are either going to be an a.m./p.m. schedule, you're on five, off five, or some type of reserve schedule where you're off two weeks and on two weeks." Joshua said the trend had been toward two on/two off but that he could not be certain that would continue. Although the nature of the a.m./p.m. and reserve day schedules are not explained, it appears that the master concluded that Joshua's schedule was generally an in-state schedule, and that he would usually get a schedule where he either worked only mornings or worked two weeks on/two weeks off if he bid for it consistently, even if he did not always get his first choice. These findings provide no basis for setting a schedule that resulted in a change to a sixty-forty division of custody.

## V. CONCLUSION

We AFFIRM the decision to set a schedule, but we conclude that it was error to set the specific schedule that the court did, because the schedule modified the parents' custody arrangement for an equal division of time with the child. We therefore RE-MAND for further proceedings consistent with this opinion.