Gregory W. BELL, Appellant,

v.

Debra L. BELL, now Debra L. Reinwand, Appellee.

No. 3615.

Supreme Court of Alaska.

June 22, 1990.

Sema E. Lederman, Hansen & Lederman and Timothy H. Stearns, Anchorage, for appellant.

Joseph P. Palmier, Palmier & Stohr, Anchorage, for appellee.

Before MATTHEWS, C.J., and RABINOWITZ, BURKE, COMPTON and MOORE, JJ.

## OPINION

MATTHEWS, Chief Justice.

Greg and Debra Bell were married in January 1986. They separated sixteen months later in July 1987. Greg filed for divorce on September 14, 1987. A Partial Decree of Divorce was entered on March 4, 1988, leaving matters related to child custody, child support and property division to be determined by a trial which resulted in this appeal.

On appeal, Greg challenges (1) the trial court's award of legal and physical custody of Scott, the parties' child, to Debra, (2) the court's basis for determining child support, and (3) the court's determination and division of marital property.

## CHILD CUSTODY

### A.

Gregory "Scott" Bell was born on August 19, 1986. While married, Greg and Debra shared most child rearing tasks on an equal basis. Since both parents were employed, Sharon Nollman babysat Scott part time beginning about December 1986, and then full time in approximately February 1987. She continued to babysit full time until February 1988, then every other week until the trial.

When Greg and Debra separated, they agreed to share custody of Scott, alternating physical custody every week or so. Both used Nollman to babysit. They accommodated each other's employment, social, and vacation schedules and shared babysitting expenses.

A two-day interim custody hearing was held before Master Andrew Brown on October 15–16, 1987. Based upon the recommendations of an Alaska Court Custody Investigator, Master Brown issued a report recommending that Scott remain in the babysitting care of Nollman and that the parties continue their weekly alternating schedule of shared physical custody of Scott. The court approved the Master's report.

Greg and Debra cooperated in the weekly custody exchanges for another ten and one-half months until trial on August 26 and 29, 1988. However, in early 1988, Debra unilaterally began placing Scott at the Saakaaya Daycare Center during the weeks that she had physical custody. Greg continued to use Nollman during the weeks that he had physical custody of Scott.

In March 1988, the parties agreed to bifurcate the proceedings. A Partial Decree of Divorce was entered April 4, 1988. All other issues were reserved for a later adjudication or agreement of the parties.

Greg and Debra continued to accommodate each other's schedules and to share physical custody of Scott on an alternating basis. They also cooperated in making major decisions about Scott's medical care. For example, after Scott was hospitalized with asthma in September 1987, Greg and Debra conferred together with medical specialists and agreed to have tubes implanted in Scott's ears.

At trial, Ardis Cry, Custody Investigator, Alaska Court System, recommended that shared legal custody continue. She further recommended that Scott have a primary home and that Debra be the primary physical custodian.

The trial court awarded legal and physical custody of Scott to Debra. The court also allowed Greg visitation with Scott (1) on alternate weekends from Friday afternoon through Monday morning and on Wednesday evening through Thursday mornings and (2) during four one-week periods spread throughout the year until Scott reaches school age.

### B.

Greg contends that the trial court erred by not awarding joint custody to both parents pursuant to AS 25.20.060. AS 25.20.-060 states, in part: "The court may award shared custody to both parents if shared custody is determined to be in the best interests of the child." In making this best-interest determination, the trial court must consider factors listed in AS 25.20.-090 [1] and AS 25.24.150(c).[2]

1. At the time of trial, AS 25.20.090 provided: In determining whether to award shared custody of a child the court shall consider
   (1) the child's preference if the child is of sufficient age and capacity to form a preference;
   (2) the needs of the child;
   (3) the stability of the home environment likely to be offered by each parent;
   (4) the education of the child;
   (5) the advantages of keeping the child in the community where the child presently resides;

   (6) the optimal time for the child to spend with each parent considering
   (A) the actual time spent with each parent;
   (B) the proximity of each parent to the other and to the school in which the child is enrolled;
   (C) the feasibility of travel between the parents;
   (D) special needs unique to the child that may be better met by one parent than the other;

We will reverse the trial court's determination "only if we are convinced that the record shows an abuse of discretion or if controlling factual findings are clearly erroneous." *McClain v. McClain*, 716 P.2d 381, 384 (Alaska 1986). *See also Julsen v. Julsen*, 741 P.2d 642, 648–49 (Alaska 1987); *Lone Wolf v. Lone Wolf*, 741 P.2d 1187, 1190 n. 2 (Alaska 1987).

■ In the present case, the trial court denied joint custody and determined that "the *physical and legal* custody of ... [Scott] ... should be vested with [Debra] subject to [Greg's] rights of visitation...." (Emphasis added.) In reviewing the propriety of the trial court's denial of joint custody, we find it necessary to distinguish between two interrelated aspects of a joint custody arrangement. First, an award of joint custody gives both parents "legal custody" of the child. This means that they "share responsibility in the making of major decisions affecting the child's welfare." 17 A.L.R.4th 1015 n. 1. Second, an award of joint custody gives both parents "physical custody" of the child. This means that "each is entitled to the companionship of the child over periodic intervals of time." *Id.*

In an act amending AS 25.20.060, the legislature drew this distinction and expressed a policy favoring the award of joint legal custody, regardless of the physical custody arrangement:

> The legislature finds that ... it is in the public interest to encourage parents to share the rights and responsibilities of child rearing. While actual physical custody may not be practical or appropriate in all cases, it is the intent of the legislature that both parents have the opportunity to guide and nurture their child and to meet the needs of the child on an equal footing beyond the considerations of support or actual custody.

An Act Relating to Child Custody, ch. 88 § 1(a), SLA 1982.

■ In light of this expression of legislative intent, and because the controlling factual finding underlying the trial court's ruling is clearly erroneous, we reverse the award of sole legal custody to Debra.

The trial court's award was apparently based on its finding that Greg and Debra "are incapable of meaningful communication and/or negotiation regarding the matters that relate to the best interests of [Scott]." [3] If this finding is correct, joint custody would be inappropriate because "cooperation between the parents is essential if joint custody is to be in the child's best interest." *Lone Wolf*, 741 P.2d at 1189. Based on our review of the record,

---

(E) which parent is more likely to encourage frequent and continuing contact with the other parent;
(7) any findings and recommendations of a neutral mediator;
(8) whether there is a history of violence between the parents;
(9) other factors the court considers pertinent.

**2.** AS 25.20.060(a) expressly requires consideration of the factors listed in AS 25.24.150(c). At the time of trial, AS 25.24.150(c) provided:

The court shall determine custody in accordance with the best interests of the child under AS 25.20.060—25.20.130. In determining the best interests of the child the court shall consider
(1) the physical, emotional, mental, religious, and social needs of the child;
(2) the capability and desire of each parent to meet these needs;
(3) the child's preference if the child is of sufficient age and capacity to form a preference;

(4) the love and affection existing between the child and each parent;
(5) the length of time the child has lived in a stable, satisfactory environment and the desirability of maintaining continuity;
(6) the desire and ability of each parent to allow an open and loving frequent relationship between the child and the other parent.

**3.** The trial court did not isolate any of the other AS 25.20.090 or AS 25.24.150(c) factors as being factually subsidiary to its ruling, other than a finding that Debra is a "much more capable" parent. With respect to denying Greg legal custody, however, the dispositive significance of this finding is undercut by the trial court's finding that "both parties can be classified as fit," and that Greg is a "good parent[ ]." The record amply supports this latter finding. The record reflects, for example, that Greg studied child development and consulted with others about Scott's needs. The child custody investigator found that Greg loves Scott and would provide him with good care. Debra also testified that "Greg is a good parent."

however, we hold that this finding is clearly erroneous.

The trial court record and Debra's arguments on appeal indicate only one area of irreconcilable conflict between Greg and Debra—throughout the proceedings below they could not agree on what form of day care would be best for Scott. Greg wanted Scott in Nollman's home, and Debra wanted Scott in Saakaaya Daycare Center.

Given the abundance of contrary evidence indicative of their ability to cooperate in Scott's best interest, however, we think that this one conflict does not warrant the trial court's finding of an "inability" to cooperate. Prior to the trial court ruling, Greg and Debra shared custody of Scott for 14 months, alternating physical custody every week or so. This arrangement was initially reached by mutual agreement. Throughout the 14 months, they accommodated each other's employment, social, and vacation schedules, and cooperated in making major decisions about Scott's medical care.

Furthermore, after interviewing Greg and Debra, the custody investigator recommended "joint legal custody" because she found that they had the "ability ... to deal with each other in a civil and mutual manner" and thought that they demonstrated "potential to facilitate cooperation and compromise." Both Greg and Debra also testified to their ability to work cooperatively in Scott's best interest. Moreover, Debra generally agreed with the investigator's recommendations and was willing to settle the custody issue under the terms the investigator recommended. Thus, at trial, both parties agreed that joint legal custody was appropriate.[4]

In light of such evidence, we are left with a firm conviction that the trial court's finding of an inability to cooperate was erroneous. We realize that the disagree-

ment over daycare relates to a fundamental child care issue. But resolution of this issue did not require denial of that which the Alaska legislature recognizes as the favored course; i.e., joint legal custody. We therefore reverse the trial court's denial of joint legal custody and remand with instructions to enter an award of joint legal custody. Because we cannot ascertain the extent to which the trial court's erroneous finding influenced its decision regarding physical custody, that portion of its judgment is vacated. On remand, the trial court shall reconsider its physical custody/visitation determination, taking new evidence as may be appropriate.

## CHILD SUPPORT

■ For the purpose of awarding child support under Civil Rule 90.3, the trial court found that Greg has a "net income of $2,500.00 per month." Based on our review of the record, we hold that this finding is clearly erroneous.

The largest figure shown in the record for Greg's income is a gross income of $26,800 per year, or $2,233 in *gross* income per month. This figure was arrived at through cross-examination of Greg by Debra's attorney, and includes earned income, rents, and payments made by Greg's business for his car, insurance, gas and oil, and some meals. Thus, there is no basis in the record for the court's determination that Greg's *net* monthly income[5] was $2,500. Nor did the trial court explain how it arrived at this figure. On remand, the trial court is instructed to make a more accurate determination of Greg's net income.

## PROPERTY DIVISION

### A.

When Greg and Debra married in January 1986, Greg was the sole stockholder of

---

4. In *McClain,* 716 P.2d at 385, we explained that the parents' agreement on a custody issue, although not dispositive of the best-interest determination, "is a pertinent factor because it demonstrates that cooperation between the parents is possible."

5. Rule 90.3 requires that child support awards be based on "adjusted annual income," which is arrived at by subtracting from gross income certain expenses; e.g., taxes. Civil Rule 90.-3(a)(1)(A). In addition to using a figure higher than the largest figure shown in the record, the trial court erred by failing to make necessary deductions.

Bay Area, Inc., which owned Valley Sawmill (Sawmill). Debra was a full-time political reporter for the Anchorage Times. At all times during the marriage, the parties maintained separate bank accounts and did not commingle their earnings. They both contributed to household expenses.

In May 1987, Debra obtained a two-year signature loan of $2,000 so that Greg could buy a "lumber tree" for Sawmill. The loan payments are approximately $100 per month. At the time of trial, both parties had made payments on the loan, and Greg had retained possession of the lumber tree.

Greg also owned a duplex at the time of the marriage. He purchased it for $103,000 in 1980, and in 1986 it was valued at $181,000. At the time of trial, the duplex was valued at $121,000. Debra claimed no interest in Sawmill or the duplex.

Greg also entered the marriage with ten acres of Point McKenzie bluff property, which he had purchased in June 1984 for $100,000 with $10,000 down and payments of $900 per month. During the marriage, both parties contributed to payments and improvements on the land. Upon separation, Greg had to deed the property back to the seller in lieu of foreclosure.

Debra entered the marriage with a 1985 Honda with payments of approximately $174 per month, some household goods, and savings of $12,000. For eleven months during the marriage, both parties made payments on the Honda. They sold it in December 1986, receiving net proceeds of $2,311.41. Then they purchased a 1984 Chevrolet pick-up for $7,200, using the proceeds of the sale of the Honda, plus $4,300 from Debra's savings and $600 contributed by Greg. The pick-up was valued at $6,000 to $6,500 at the time of trial, and was in Greg's possession.

During the marriage, Debra also made the following purchases: $1,500 for a king-size bed, $1,000 for a video camera, and $300 for a vacuum cleaner. At the time of the trial, Greg had retained possession of these items.

At trial, Debra asked the court to have Greg reimburse her for all payments made during the marriage from her premarital funds. She claimed to have contributed premarital funds of $15,300 to the marital estate.

The trial court ruled that each party would keep the property they had in their possession, and ordered Greg to reimburse Debra the sum of $15,300, as follows:

1. $1,000 for Debra's contribution to the king-size bed.

2. $1,000 for Debra's contribution to the video camera.

3. $300 for Debra's contribution to the vacuum cleaner.[6]

4. $6,600 for Debra's contribution to the Chevrolet pick-up.

5. $2,000 for payments which Debra made on the signature loan used to buy a "lumber tree" for Sawmill.

6. $4,400 attributable to Debra's contributions from her premarital assets to the Point McKenzie or other payments made to Greg.[7]

### B.

Our decisions in *Wanberg v. Wanberg*, 664 P.2d 568 (Alaska 1983) and *Merrill v. Merrill*, 368 P.2d 546 (Alaska 1962) set forth the method for determining property dispositions upon divorce. This method involves (1) identifying the specific property available for distribution, (2) determining the value of this property, and (3) determining the most equitable division of the property, beginning with the presumption that an equal division is most equitable. *Wanberg*, 664 P.2d at 570, 574–75; *Merrill*, 368 P.2d at 547–48 n. 4 (setting forth factors relevant to determining the most equitable division).

However, in *Rose v. Rose*, 755 P.2d 1121 (Alaska 1988), we recognized that an "alternative" method of distributing property

---

6. The court stated that Greg could return the video camera and the vacuum cleaner to Debra in lieu of making a cash reimbursement for these items.

7. As indicated, all of these items were in Greg's possession except for the Point McKenzie property.

may be appropriate in "marriages of short duration, where there has been no significant commingling of assets between the parties." *Id.* at 1124–25. Under this method, the property division is treated "as an action in the nature of rescission, aimed at placing the parties in, as closely as possible, the financial position they would have occupied had no marriage taken place." *Id.* at 1125. Applying this method in *Rose,* we upheld a trial court ruling which essentially permitted each party to retain assets each had acquired with premarital funds as well as money earned during marriage but kept in separate bank accounts. *Id.* at 1123–25.

■ In the present case, the trial court found that "during this very short marriage, there was no merger of the assets and liabilities of the parties."[8] The court then applied a remedy apparently aimed at rescinding the parties' financial relations. It permitted each party to retain whatever property was in his or her possession, and ordered Greg to reimburse Debra for contributions made by Debra for property which was retained by Greg.[9]

Greg claims that the trial court should have applied the three-step analysis set forth in *Wanberg,* and erred by applying a remedy in the nature of a rescission. He argues that *Rose* is inapplicable because the parties commingled assets during marriage. We agree.[10]

The parties combined thousands of dollars to acquire and improve various property. According to the trial court, Debra contributed approximately $4,400 in payments on the Point McKenzie property. Title to the property was in Greg's name, and he contributed a $10,000 down payment, as well as approximately $16,000 in monthly payments for its acquisition. Both parties also contributed towards improvements on

the land, such as the construction of a road and some buildings.

Both parties also made payments on Debra's Honda prior to its sale. The proceeds of that sale, $2,300, together with $4,300 from Debra's savings and a $600 contribution from Greg, were used to purchase the pick-up truck.

Similarly, both parties made payments on the $2,000 loan which was obtained by Debra to finance the purchase of the "lumber tree."

In light of the fact that each party earns less than $30,000 per year, the size of these commingled investments is hardly insignificant. This is in marked contrast to the situation in *Rose,* where the parties did not make any commingled investments and thereby "maintained completely separate economic identities." 755 P.2d at 1125.

We also doubt the propriety of using a reimbursement remedy where the value of the assets to which there has been mutual contribution by the parties greatly depreciate or appreciate in value. *See id.* at 1125 (noting that none of the disputed assets appreciated in value during the marriage). To do so may result in one party bearing the entire loss (should there be depreciation) or enjoying the entire gain (should there be appreciation). In the present case, for example, there was uncontradicted testimony that most of the disputed assets greatly depreciated in value.[11] Indeed, the Point McKenzie investment resulted in a total loss. By awarding Debra amounts at or near her original contributions to these assets, the trial court, without explanation, shifted the entire loss to Greg.

We have considered and rejected as a solution an instruction to the trial court to reduce Debra's reimbursement award in proportion to the loss in value. The *Rose*

---

8. The parties were married for only 16 months.

9. Greg did not claim that he made any contributions to property retained by Debra.

10. Since the question whether the trial court employed the correct legal analysis is a question of law, review of Greg's claim is based upon our independent judgment. *See Wanberg,* 664 P.2d at 570.

11. Debra purchased the bed for $1,500, the video camera for $1,000, and the vacuum cleaner for $300. The pick-up was purchased by both parties for $7,200. At trial, Greg testified that the bed, camera, vacuum cleaner, and pick-up depreciated to values of about $400, $200, $150, and $6,000 to $6,500, respectively.

approach to property division should be confined to those situations where unraveling the financial relations of the parties is a relatively simple task. We therefore reverse the trial court's ruling with respect to property division. On remand the trial court is instructed to divide the property in accordance with the approach we outlined in *Wanberg*. We note that all of the disputed property potentially available for distribution was acquired during marriage,[12] and is therefore divisible. *See* AS 25.24.-160(a)(4). We do not reach questions related to its valuation and allocation. However, we point out that the length of the marriage, and the extent to which the parties separately contributed to the acquisition of these assets, is relevant to the question of equitable allocation. *See Merrill,* 368 P.2d at 547–48 n. 4.

REVERSED and REMANDED.

**12.** This would include the truck, lumber tree,    bed, video camera, and vacuum cleaner.