Robert FARRELL, Appellant,

v.

Ruth FARRELL, Appellee.

No. S–3959.

Supreme Court of Alaska.

Nov. 1, 1991.

Peter F. Mysing, Kenai, for appellant.

Robin Bronen, Michael Gershel, Carol Daniel, Alaska Legal Services Corp., Anchorage, for appellee.

Before RABINOWITZ, C.J., and BURKE, MATTHEWS, COMPTON and MOORE, JJ.

## OPINION

MATTHEWS, Justice.

In this domestic relations case, Robert Farrell appeals from the superior court's grant of sole legal custody of the parties' children to their mother, Ruth. He also disputes the court's child support and property division determinations.

## FACTUAL BACKGROUND

Ruth and Robert Farrell were married on March 18, 1975. They permanently separated in January 1988, and divorced on November 22, 1989. Four children were born during the marriage: Robert, Jr., born July 19, 1978; Doris, born August 9, 1979; Jamie, born December 19, 1981; and Mary Lou, born April 5, 1983. Both Ruth and Robert had children from previous relationships. Helen Wakefield, Robert's daughter, lived with the Farrells off and on between 1980 and 1984. Robert has another daughter who also lived with the parties occasionally. Carl Dexter, Ruth's son, lived with the Farrells continuously from 1974 until 1980, and then sporadically until 1985. Carl and Helen are now adults.

Robert was the family's sole financial provider. He was employed in the oil industry during the marriage and remains employed by the industry as a drilling supervisor. Robert does not have an established work schedule and his employment requires him to be away from home for extended periods. At the time of trial, he was required to be on-call twenty-four hours a day for possible departures from home for jobs. However, he is reasonably able to determine his work schedule through his placement on the call-out list.

The parties have greatly disparate earning capacities. Robert earns a base monthly salary of $3,500. He receives an additional $300 per day for each day he is employed in the field. According to Robert, his monthly salary fluctuates between $3,500 and $10,000, and averages $7,000 per month. Based on his 1988 income tax return, Judge Katz found Robert's net income to be $72,066, yielding a net monthly income of $6,005.50. Judge Katz found that Ruth had a net monthly income of $600. She did not work outside of the home during the marriage, but has worked on and off since the separation as a cook for $4 an hour. When she worked in the summer she grossed about $930 a month, and in the fall and winter of 1989 she grossed $400 a month. Ruth was not working at the time of trial. She plans to obtain clerical skills at a vocational school.

Robert and Ruth both drank alcohol excessively during their marriage. Since Ruth began alcohol counseling in 1985 she has remained sober, with only one exception. Robert continues to drink and drinks in the presence of the children.

The relationship between Robert and Ruth included much domestic violence, often associated with the parties' drinking. Ruth has hit, bitten and scratched Robert

and the children. Robert has assaulted Ruth and Carl. In one incident Robert chased Ruth, Bobby, and Carl out of the home with a gun. The police were called and removed Robert from the home. Following this episode, Ruth resided in a battered women's shelter for a month.

Ruth admits that she did not have a good relationship with the children during the marriage, although she believes it is better now because she is not drinking. The older children, Helen and Carl, testified that they had significant child care responsibilities and that Ruth was not an adequate caregiver. Robert and Ruth separated several times in the course of the marriage. During two of these separations, Ruth left the children in the care of Robert. The parties separated permanently when Robert moved out of the family home and into a house with his fiancee, Sharon Rusnak.

Robert filed for divorce in November of 1988, seeking dissolution of the marital relationship, custody of the children, and an equitable property division. Ruth answered and counterclaimed for custody of the children. The matter was bifurcated; the Decree of Divorce was granted by Judge Ripley on November 22, 1989, and the issues of child custody, child support, spousal support, and property division were de-

cided by Judge Katz on February 27, 1990. Robert brings this appeal contending that the superior court erred by granting sole legal custody of the children to Ruth, and that the child support award and property division were improperly calculated.

## DISCUSSION

### I. Child Custody

Trial courts are vested with broad discretion in child custody matters. *Gratrix v. Gratrix,* 652 P.2d 76, 79 (Alaska 1982). This court will reverse a trial court's resolution of custody issues only if it is convinced that the record shows an abuse of discretion or if controlling factual findings are clearly erroneous. *Id.* at 79–80; *Horutz v. Horutz,* 560 P.2d 397, 399 (Alaska 1977). "Abuse of discretion is established if the trial court considered improper factors or failed to consider statutorily-mandated factors, or improperly weighted certain factors in making its determination." *Gratrix,* 652 P.2d at 80.

Robert contends that Judge Katz disregarded the legislature's expressed preference for joint custody.[1] Her findings of fact and conclusions of law indicate, however, that she properly based her decision on the factors outlined in AS 25.20.-090:[2]

1. In an act amending AS 25.20.060, the legislature distinguished legal and physical custody and expressed a preference for joint legal custody:

   The legislature finds that ... it is in the public interest to encourage parents to share the rights and responsibilities of child rearing. While actual physical custody may not be practical or appropriate in all cases, it is the intent of the legislature that both parents have the opportunity to guide and nurture their child and to meet the needs of the child on an equal footing beyond the considerations of support or actual custody.

   An Act Relating to Child Custody, ch. 88 § 1(a), SLA 1982, *quoted in Bell v. Bell,* 794 P.2d 97, 99 (Alaska 1990).

2. AS 25.20.090 states:

   In determining whether to award shared custody of a child the court shall consider
   (1) the child's preference ...;
   (2) the needs of the child;
   (3) the stability of the home environment likely to be offered by each parent;
   (4) the education of the child;

(5) the advantages of keeping the child in the community where the child presently resides;
(6) the optimal time for the child to spend with each parent considering
(A) the actual time spent with each parent;
(B) the proximity of each parent to the other and to the school in which the child is enrolled;
(C) the feasibility of travel between the parents;
(D) special needs unique to the child that may be better met by one parent than the other;
(E) which parent is more likely to encourage frequent and continuing contact with the other parent;
(7) any findings and recommendations of a neutral mediator;
(8) any evidence of domestic violence, child abuse, or child neglect in the proposed custodial household or a history of violence between the parents;
(9) evidence that substance abuse by either parent ... directly affects the emotional or physical well-being of the child;

[I]t is in the best interest of the children to award [Ms. Farrell] sole legal and physical custody. Joint custody is not in the best interest of the children for the following reasons:

a. Ms. Farrell has been the children's primary caretaker. Due to Mr. Farrell's work schedule, she is in the best position to parent the children on a day-to-day basis. Stability for the children in their parents' decision-making would best be served by granting sole custody to [Ms. Farrell].

b. The parties fought bitterly during the marriage and do not appear to have shared decision-making. While they are to be commended for their willingness to cooperate in more recent times regarding visitation and medical matters, this does not negate their protracted history of non-cooperation. Ms. Farrell remains fearful of Mr. Farrell, a circumstance which militates against good communication in the children's best interest. The court finds the children would be better served by knowing that they will not be the "cause" of further friction between their parents, and additionally by knowing that decisions made by their mother can be relied upon and not be changed by recourse to their father.

c. Mr. Farrell continues to drink. While he has not been violent towards the children, given the damage caused to them through the use of alcohol in their family, a custodial parent who does not consume alcohol would provide a better role model.

We find that Judge Katz did not disregard the legislature's directives.

Robert next contends that Judge Katz misapplied the criteria contained in AS 25.-20.090 and AS 25.24.150. His argument is broken down into three parts: (1) it was clearly erroneous to find that Ruth was the primary caregiver; (2) the domestic violence between Ruth and Robert should not

have been considered since it does not indicate that they could not cooperate in raising the children; and (3) Robert's alcohol consumption is irrelevant to the decision regarding joint custody because it does not affect the children or his fitness as a parent.

Robert's argument turns on the distinction between legal and physical custody; he asserts that the superior court confused the two concepts. We outlined the differences between legal and physical custody in *Bell v. Bell,* 794 P.2d 97 (Alaska 1990):

[A]n award of joint custody gives both parents "legal custody" of the child. This means that they "share responsibility in the making of major decisions affecting the child's welfare." 17 A.L.R. 4th 1015 n. 1. Second, an award of joint custody gives both parents "physical custody" of the child. This means that "each is entitled to the companionship of the child over periodic intervals of time." *Id.*

... [T]he legislature [has drawn] this distinction and expressed a policy favoring the award of joint legal custody, regardless of the physical custody arrangement.... [3]

*Id.* at 99.

We explained that joint legal custody is only appropriate when the parents can cooperate and communicate in the child's best interest. In concluding that the trial court in *Bell* erred by denying joint legal custody, we emphasized the custody investigator's conclusion that the parties had the "ability ... to deal with each other in a civil and mutual manner" and had "demonstrated potential to facilitate cooperation and compromise." *Id.* at 100. It was also significant that the parents agreed at trial that joint legal custody was appropriate and testified regarding "their ability to work cooperatively in [the child's] best interest." *Id.;* [4] *see also Lone Wolf v. Lone*

---

(10) other factors the court considers pertinent.

**3.** The legislature's statement is quoted *supra* at note 1.

**4.** This case is easily distinguished from *Bell.* Here, there were no findings or testimony that the parents could cooperate in the children's best interest. Furthermore, there was no evidence in *Bell* of domestic violence or alcohol

*Wolf,* 741 P.2d 1187, 1189 (Alaska 1987) ("cooperation between parents is essential if joint custody is to be in the child's best interest"); *McClain v. McClain,* 716 P.2d 381, 386 (Alaska 1986) ("The most ardent proponents of joint custody assume cooperation between parents and agreement about child rearing practices as basic requirements for joint custody.").

■■■ Robert does not dispute that the test for evaluating the propriety of joint legal custody is whether or not the parties can cooperate and communicate regarding the children. Rather, he asserts that the test was misapplied. In Robert's view, his drinking and the parties' long history of domestic violence are both irrelevant to this determination. Judge Katz found that the history of domestic violence between the parties made it unlikely that they would be able to communicate and cooperate regarding the children. Robert, however, asserts that the inability to cooperate has not been demonstrated because "this domestic violence was mutual with both of the parties acting the aggressor at different times" and "both spouses were active participants in the abuse against each other."[5] The fact that the aggression was mutual does not make cooperation any more probable. We find that Judge Katz did not err by concluding that the parties' history of domestic violence interfered with their ability to cooperate regarding the children.

Judge Katz also did not err in considering Robert's drinking. Robert cites *Horutz v. Horutz,* 560 P.2d 397 (Alaska 1977), as stating that the lifestyle, habits, or character of a parent are only relevant to a custody determination if they affect the parent's relationship to the child. Robert contends that since his drinking does not affect his relationship with the children, it was improper for the court to consider it. It is true that we announced this standard in *Horutz, see id.* at 401 nn. 15 & 16;

however, at issue there was the alleged promiscuity of the mother as shown by "the fact that [she] lived in a state of sexual cohabitation without the benefit of marriage." As a "character trait" Robert's drinking is significantly different from Horutz's cohabitation; hence, our discussion in *Horutz,* as well as the authorities on which we relied, are distinguishable. Furthermore, it is probable that Robert's drinking affects the parties' ability to cooperate and communicate. Most of the domestic violence in the course of marriage occurred when the parties were intoxicated, and Ruth testified that she is afraid of Robert because he still drinks.

Finally, there is support in the record for a finding that the parties cannot adequately communicate regarding the children. When asked whether she and Robert have been getting along better in the last year than they had previously, Ruth responded, "We hardly talk."[6] It appears that Ruth and Robert only communicate through the children. Ruth testified that she is "too scared" of Robert to assert herself if she felt really strongly about something.

Communication and shared decisionmaking have improved since the separation, and it is true that Robert appears to be genuinely interested in being a good father. However, there is adequate support in the record for the superior court's decision to award Ruth sole custody. The court did not abuse its discretion by giving relatively less weight to the evidence suggesting improved communication between Ruth and Robert and more weight to the evidence indicating insufficient communication. *See Lone Wolf,* 741 P.2d at 1190.

## II. The Child Support Award

■■ Child support awards are within the broad discretion of the trial court. They are judged using an abuse of discretion standard and are not set aside unless after

---

abuse; the only parenting-related dispute concerned the proper day care provider.

5. Robert also alleges that the last act of violence between the parties was in May of 1986, three years before trial. Ruth, however, disagrees and contends that in October of 1988 a fight

broke out regarding Robert's visitation with one of the children. As a result, an emergency domestic violence order and a 90–day domestic violence order were issued.

6. When pressed, she, however, admitted, "As far as the kids are concerned? I guess so."

reviewing the record as a whole we are left with a definite and firm conviction that a mistake has been made. *Richmond v. Richmond,* 779 P.2d 1211, 1216 (Alaska 1989). The trial court awarded Ruth child support of $2,162.00 per month. This is challenged on two grounds.

### A. *Application of Rule 90.3 to the Visitation Schedule*

■ Robert first contends that the court erred by applying the formula contained in Civil Rule 90.3(a) instead of the formula in Rule 90.3(b). Rule 90.3(a) applies when one parent has sole or primary physical custody, and 90.3(b) applies when there is shared physical custody. There is shared physical custody if the children reside with the parent for at least 30% of the year or 110 overnights. *See* Rule 90.3 Commentary V(A). A child must remain overnight with the parent for it to count toward the required total. *Id.*

Judge Katz's decree is unclear in several respects.[7] Robert interprets the decree as entitling him to 128 days of visitation, and Ruth interprets it as entitling Robert to 109 days of visitation.[8] The portion of the decree discussing Spring Break visitation is especially ambiguous as it specifies that Robert shall be entitled to more visitation if he takes the children on a trip. There is also a question whether Robert's work schedule will allow him to exercise his full visitation rights.[9] The eight weeks of summer visitation may be especially problematic given the uncertainty in Robert's schedule and the long periods he is required to be away from home. There also may be some difficulty in exercising the four nights of monthly visitation if it interferes with the children's performance in school.[10]

In light of these questions, we remand to the superior court for a specific determination of whether Robert's visitation is above or below Rule 90.3's 30% mark. Not only will Judge Katz be able to clarify the decree, but, since the decree will have been in effect for over a year, she can evaluate whether Robert has been able to exercise the full visitation to which he is entitled.

### B. *Standard for Waivers of $60,000 Income Cap Under Rule 90.3*

Robert also contends that the trial court erred by disregarding the $60,000 income

---

7. The decree states:
   a. He shall visit with the children two weekends during each month, to be determined by his work schedule. If it appears probable to him that he will not have two weekends at home during any particular month, he may have the children for up to five days during the week.
   b. This arrangement for weekday visitation shall be subject to modification if either party receives a report from the children's teachers that the children are responding differently to classroom activities during periods in which they reside with Mr. Farrell.
      . . . .
   d. Assuming [Mr. Farrell's] availability, he shall visit with the children for five consecutive days during the school spring vacation and for seven consecutive days during the school Christmas vacation. [Mr. Farrell] may have the children for the entire spring vacation should he take them on a trip during that time. The parties shall alternate the major holidays [Thanksgiving and Christmas days] to the extent practicable pursuant to [Mr. Farrell's] schedule. . . . The children shall also visit with Mr. Farrell on Father's Day and Ms. Farrell on Mother's Day.
   5. Mr. Farrell is granted summer visitation as follows: He shall visit with the children for up to one month at a time when he is not working. His total summer visitation shall not exceed eight weeks.

8. The difference between Robert's and Ruth's total visitation time is in part the result of Robert counting days instead of nights, and his misreading of the decree. Robert counted seven nights for Spring Break while the decree awarded only four. He also counted two months of summer visitation even though the decree specifies a maximum of eight weeks.

9. The court found that Robert's work schedule would make scheduling visitation somewhat difficult.

10. The commentary to Rule 90.3 discusses the potential problem of basing a finding of shared custody on a visitation schedule that is as speculative as this one is:
   One difficulty with tying the amount of support in shared custody cases to the amount of time each parent is expected to spend with the children is that parents often fail to exercise visitation. If this regularly occurs, the custodial parent may be forced to seek a modification based on the failure to exercise visitation. Commentary V(D).

cap contained in Rule 90.3(c)(2). The provision states:

> Paragraphs (a) and (b) do not apply to the extent that the parent has an adjusted annual income of over $60,000. In such a case, the court may make an additional award only if it is just and proper, taking into account the needs of the children, the standard of living of the children and the extent to which that standard should be reflective of the supporting parent's ability to pay.

Robert argues that the requirements contained in Rule 90.3(c)(1) apply when the $60,000 cap is disregarded to the same extent that they apply when the court deviates from the rule's other guidelines. Rule 90.3(c)(1) states in relevant part:

> The court may vary the child support award as calculated under the other provisions of this rule for good cause upon proof by clear and convincing evidence that manifest injustice would result if the support award were not varied.

■ Specifically, Robert contends that the court's disregard of the $60,000 cap was not justified by good cause supported by clear and convincing evidence of potential manifest injustice. We are not persuaded that the requirements of Rule 90.-3(c)(1) apply to waivers of the $60,000 cap. Subsection (c)(2) contains its own standards and does not cross-reference (c)(1). Consequently, the additional award will be upheld "only if it is just and proper, taking into account the needs of the children, the standard of living of the children and the extent to which that standard should be reflective of the supporting parent's ability to pay." Rule 90.3(c)(2).

■ Judge Katz's findings show that she specifically considered the Rule 90.3(c)(2) requirements, and adequately explained her reasons for disregarding the $60,000 cap. We find that she did not err in making the additional award.

## III. Property Division

The parties' property subject to division consists of real property and Robert's pension with Parker Drilling, one of the oil companies for which he worked.[11] The parties own three adjoining lots in Kenai, and Robert built the marital residence on one of them.[12] The parties have agreed to sell the marital residence and the two adjoining lots. No evidence was presented regarding the market value of the house or the lots, but they were appraised at $103,000 for property tax purposes. As of November 4, 1986, approximately $13,000 was owed on the properties. Robert continued to make payments, and the debt had been reduced to $2,188 at the time of trial.

The superior court ruled that Ruth should receive 70% of proceeds from the sale of the real property and Robert should receive the remaining 30%. Robert was ordered to pay the remaining debt. The court denied Ruth's request for rehabilitative and reorientation alimony finding that her "support needs can be taken care of by awarding her a greater than 50% share of the net proceeds from the sale of the real property and marital residence."

■ The factors to be considered by the trial court in determining alimony and division of property questions are:

> the respective ages of the parties; their earning ability; the duration and conduct of each during the marriage; their station in life; the circumstances and necessities of each; their health and physical condition; their financial circumstances, including the time and manner of acquisition of the property in question, its value at the time and its income producing capacity if any.

*Merrill v. Merrill*, 368 P.2d 546, 547–48 n. 4 (Alaska 1962).

■ Robert contends that the superior court overlooked several important factors in deciding on a 70–30 split of the real estate. He directs us to our statement that "[i]t is generally presumed that a 50–50 property division is the most equitable

---

11. The ruling that the $3,600 from the pension plan should be split 50–50 is not contested.

12. The residence was not finished at the time of trial and was inadequately heated.

starting point." *Jones v. Jones,* 666 P.2d 1031, 1034 (Alaska 1983). However, we have held repeatedly that a spouse's support needs should be met through property division. *See, e.g., Richmond v. Richmond,* 779 P.2d 1211, 1215 (Alaska 1989); *Dixon v. Dixon,* 747 P.2d 1169, 1173 (Alaska 1987) ("When a couple has sufficient assets, the spouse with the smaller earning capacity can and should receive a larger share in the property distribution to aid him or her in this transition."). In light of Ruth and Robert's greatly disparate earning potential, we find that Judge Katz did not abuse her discretion in weighting the property division in Ruth's favor.[13]

For the reasons stated, the judgment is affirmed as to the award of child custody and the division of property, and vacated and remanded with respect to the award of child support.

AFFIRMED in part, VACATED in part, and REMANDED for further proceedings.

RABINOWITZ, C.J., dissents in part.

RABINOWITZ, Chief Justice, dissenting in part.

Given the legislatively mandated presumption in favor of shared legal custody, and upon consideration of the relevant evidence in the record, I conclude that the superior court erred in denying Robert shared legal custody of the parties' children.[1] Here the evidence shows that over a significant period of time prior to trial Robert and Ruth were able to communicate and cooperate to the extent of making decisions concerning visitation and the children's upbringing. Neither the parties' past history of domestic violence nor Robert's drinking appears to have prevented adequate communication between the parties or their ability to reach decisions concerning visitation and the children's needs.

I would therefore reverse the superior court's custody decision and remand with directions to enter a decree which provides for shared legal custody.

---

13. Robert contends that the trial court failed to credit him with post-separation payments he made which reduced the debt on the real property awarded to Ruth, thus creating a further imbalance in the real property award. It appears, however, that the trial court considered these payments in reducing interim child support in an amount which over time roughly offset the debt reduction. The court did not err in failing to give further credits to Robert.

