**Diane G. LOWDERMILK, Appellant,**

**v.**

**Samuel E. LOWDERMILK, Appellee.**

**No. S–3565.**

Supreme Court of Alaska.

Feb. 7, 1992.

■

Allison E. Mendel, Anchorage, for appellant.

William T. Ford, Anchorage, for appellee.

Before MATTHEWS, C.J., and RABINOWITZ, BURKE, COMPTON and MOORE, JJ.

## OPINION

COMPTON, Justice.

## I. DID THE TRIAL COURT ERR IN DENYING DIANE'S MOTION TO DISQUALIFY SAMUEL'S ATTORNEY FOR CONFLICT OF INTEREST?

### A. *Facts*

Diane was represented by Homer Burrell in a custody dispute with Philip Holman concerning their child Jamie. Diane and Samuel eventually became concerned about the quality of Burrell's work. Samuel asked William Ford, his attorney in other matters including a domestic violence proceeding involving Diane, to look into the adequacy of Burrell's representation of Diane in the custody dispute over Jamie. Ford says he told Samuel he did not want to get involved because Samuel had consulted Ford about a divorce, creating a potential conflict of interest. Samuel nevertheless brought Burrell's case file to Ford, who "did not review" it, but only "glanced through" it. Ford also reviewed the court file.

Burrell stated to the court that his file contained no mental impressions or attorney work product, but only mirrored the contents of the court file plus billings and copies of legal opinions. He also stated that during the only conversation he had with Ford about the matter he expressed no opinion concerning Diane's suitability as a parent.

The trial court denied Diane's motion to disqualify Ford, stating that it was unable to find that there was a former professional relationship between him and Diane and that there was no substantial possibility that Ford gained any knowledge in his contacts with Burrell and exposure to the file which could be used against her.

### B. *Discussion*

■ We will reverse a trial court's decision concerning a motion to disqualify opposing counsel only when it constitutes an abuse of discretion. *Munn v. Bristol Bay Hous. Auth.*, 777 P.2d 188, 196 (Alaska 1989).

This court has stated:

We believe that an attorney may not represent a third party against a former client where there exists a substantial possibility that knowledge gained by him in the earlier professional relationship can be used against the former client, or where the subject matter of his present undertaking has a substantial relationship to that of his prior representation.

*Aleut Corp. v. McGarvey*, 573 P.2d 473, 474–75 (Alaska 1978). The superior court found that no professional relationship existed. This finding is supported by evidence that Diane never consulted with Ford and that Ford did not have access to confidential information about Diane. Since Ford did not have access to confidential information, there was nothing he could possibly use against Diane. Since there was no "prior representation," we need not determine whether the subject matter in this case has a substantial relationship to the custody dispute between Diane and Philip Holman. The order is affirmed on this issue.

## II. PROPERTY DIVISION.

### A. *Facts*

At the time of the parties' marriage, Samuel owned and operated full-time a car business, known as Alaska Motor Doctor, out of his garage. During the marriage, he continued to operate the Alaska Motor Doctor full-time, except for a nine-month to

one-year period during which he took a second job and worked at the Alaska Motor Doctor part-time.

Diane also worked at the Alaska Motor Doctor during the marriage, though evidence as to the extent of her involvement is conflicting. The evidence indicates that at least she picked up parts at various times and performed some administrative tasks for the business.

The superior court determined that Alaska Motor Doctor was Samuel's separate property.

A 1985 Ford Bronco was purchased during the marriage. Diane made the down payment, but the evidence is conflicting as to whether Samuel reimbursed her fully or only for half of it. Samuel made the monthly payments out of his separate retirement account, and at one point he borrowed $5,000 to redeem it from repossession after he fell behind in the payments. The superior court found that Samuel repaid Diane for the funds she advanced and that the Bronco was Samuel's separate property.

Samuel sought reimbursement for roughly $17,000 worth of time and money he claimed he expended on two houses which were Diane's separate premarital property. As proof of expenditures he introduced some of the checks he remembered were expenditures for material used on Diane's properties. He had no receipts or other record of expenditures, and Diane testified she had "no doubt" that she paid for all of the materials used on her houses out of her separate account. Samuel claimed he spent 460 hours of labor on the houses, 163 of which he performed before the marriage. The superior court determined he was entitled to reimbursement for half of his claimed expenditures and labor.

### B. Discussion

■ When a marriage is of long duration or assets are commingled, the method for determining property division is governed by *Wanberg v. Wanberg*, 664 P.2d 568 (Alaska 1983), and *Merrill v. Merrill*, 368 P.2d 546 (Alaska 1962). When the marriage is of short duration and the par-

ties do not commingle assets, an alternative method is to treat property division as if it were contract rescission. *Rose v. Rose*, 755 P.2d 1121 (Alaska 1988). In *Bell v. Bell*, 794 P.2d 97, 102 (Alaska 1990), we held the alternative method was unavailable, even though the marriage was of short duration, because the couple had "combined thousands of dollars to acquire and improve various property." *Bell* is not apposite here because the Bells' commingling of assets was significantly more substantial than the Lowdermilks'. However, the superior court did not use the alternative method of *Rose*, which requires that it put the parties back to the positions they were in before the marriage. The superior court instead reimbursed Samuel for his efforts both before and during the marriage, while giving him the entire benefit of Diane's efforts towards Motor Doctor during the marriage.

The correct method of property division in this case is the method set forth in *Wanberg* and *Merrill*. It involves (1) identifying the specific property available for distribution, (2) determining the value of this property, and (3) determining the most equitable division of the property, beginning with the presumption that an equal division is most equitable. *Bell*, 794 P.2d at 101; *Wanberg*, 664 P.2d at 570, 574–75.

### C. Did the Superior Court Err in Finding that The Alaska Motor Doctor and All of its Assets were Samuel's Separate Property?

■ The superior court found that Alaska Motor Doctor was Samuel's separate property. Diane asserts that any increase in Alaska Motor Doctor's tangible assets acquired after the marriage, including inventory and accounts receivable, is marital property subject to division. We agree.

■ Alaska Statute 25.24.160 allows the trial court to divide the property, whether joint or separate, acquired only during marriage, in a just manner. The time and energy of both spouses during the marriage is to be considered in dividing marital property. *See, e.g., Bussell v. Bus-*

sell, 623 P.2d 1221, 1223–24 (Alaska 1981). Samuel should not be allowed to take his contributions of time and energy out of the marital estate by rolling them back into a business which he began before the marriage. Diane devoted much of her time and energy during the marriage to caring for the couple's child and keeping the family home. It is also undisputed that she made some direct contribution to the business during the marriage. It is "an abuse of discretion for the trial court to shield the property from equitable distribution merely by affixing to the property the label of 'pre-marital asset.'" Wanberg, 664 P.2d at 572. This is exactly what the superior court did with Alaska Motor Doctor. Our comments in Wanberg apply equally well to this case:

> There may well be reason for granting less than an even share in this property to [the other spouse], but we hold that such a determination must be made through the exercise of the trial court's equitable discretion, to be guided by the factors relevant to such determinations, and to be articulated in terms of those factors.

Id.

D. *Did the Trial Court Err in Classifying the Bronco as Separate Property?*

■ Property purchased during a marriage, yet paid for out of one party's separate assets, may be considered a premarital asset so long as the parties did not demonstrate an intent to jointly hold the property. See Carlson v. Carlson, 722 P.2d 222, 224–25 (Alaska 1986). Samuel presented evidence that he ultimately paid for the Bronco entirely out of his own premarital property. The superior court accepted Samuel's evidence and found that the Bronco was Samuel's separate property. This finding is not clearly erroneous.

E. *Did the Trial Court Err in Reimbursing Samuel for Work Accomplished on Diane's Separate Property?*

■ The superior court accepted Samuel's testimony about his expenditures on Diane's separate property, and found that he was entitled to reimbursement for half that amount. This finding is not clearly erroneous in light of the evidence presented. Samuel's evidence consisted of his own recollection of the work he performed. Although he had no receipts for materials purchased, he presented independent documentary evidence consisting of a sampling of checks he said were for materials for Diane's properties. Diane testified that she had "no doubt" that she paid all of the separate property expenses out of her own account. Jim Black, who worked on Diane's properties on jobs for which Samuel claimed reimbursement rights, testified that many of the jobs Samuel listed were either not done or took substantially less time to accomplish than Samuel claimed. On the record as a whole, we are not left with a definite and firm conviction that the trial court made a mistake.

■ However, the trial court failed to distinguish pre-marital from post-marital expenditures. Samuel is not entitled to reimbursement for expenditures made gratuitously and not in contemplation of marriage. The trial court must determine what portion of the 163 hours of labor performed prior to the marriage, if any, are subject to reimbursement.

## III. DID THE TRIAL COURT ERR IN AWARDING CUSTODY OF CHRISTOPHER TO SAMUEL?

The issue of custody must be remanded for reconsideration, in light of the inadequacy of the record to support certain findings, consideration of improper factors, and failure to consider mandated factors. The trial court may take additional evidence on interim conditions when reconsidering custody.

■ The trial court considered improper factors and at the same time failed to consider statutorily mandated factors. See McClain v. McClain, 716 P.2d 381, 385 (Alaska 1986). The court's written findings state:

> DIANE LOWDERMILK was generally not a credible witness and it was difficult

to believe anything she said. She also projects her feelings onto other persons. The court specifically finds that DIANE LOWDERMILK is unstable. The court believes the testimony of Dr. Cassell regarding both parties. The comments and findings made by the court in *Holman v. Lowdermilk* apply in this case as well. The court also finds DIANE LOWDERMILK does not see the world as the average person sees it, and would therefore not be a good role model for the child. The court finds that DIANE LOWDERMILK has undermined the child/father relationship by her conduct and the court had no confidence that this is likely to change in the future.

██ It was improper to consider that Diane "does not see the world as the average person sees it" without any articulated explanation of what these statements mean and how such factors affect her parenting ability.[1] This finding bears on her mental state, and there must be a nexus between mental state and parenting ability for it to be a proper consideration. *See Morel v. Morel*, 647 P.2d 605, 608 (Alaska 1982).

██ The court ignored the issue of spousal abuse, a factor it is required to consider by AS 25.24.150(c)(7), despite extensive evidence of spousal abuse in the record. Although detailed findings on every factor mandated by AS 25.24.150(c) are not required where the factor is not at issue, spousal abuse was unquestionably at issue in this case. The court abused its discretion by failing to make findings in regard to spousal abuse, its effect on Diane, and its effect—if any—on Diane's apparently unacceptable mental state, i.e. her instability.

## IV. DID THE TRIAL COURT ERR IN DENYING DIANE'S COUNTER-CLAIM SEEKING COMPENSATION FOR INJURIES RESULTING FROM DOMESTIC VIOLENCE INCIDENTS?

██ In its written findings of fact, the superior court stated: "The court finds that as to the assaults alleged in the counter claim, that they were not intentionally inflicted, but came about because of DIANE LOWDERMILK'S own actions." We are unable to discern from this statement the basis of the superior court's denial of Diane's tort claim. Samuel admitted that he intended the contact which resulted in Diane's injuries. A person is liable for assault and battery if the person intends to cause harmful or offensive contact. *Merrill v. Faltin*, 430 P.2d 913, 917 (Alaska 1967). Intent to cause physical injury is not required. It is unclear from the finding quoted above whether the superior court found Samuel was not liable because he had an affirmative defense or for some other reason, or that the court applied the incorrect legal standard. This issue is remanded to the superior court for redetermination.

## V. CONCLUSION.

The superior court's order denying Diane's motion to disqualify Mr. Ford for conflict of interest is AFFIRMED. The decree of divorce is AFFIRMED in part, REVERSED in part, and REMANDED for proceedings consistent with this opinion.

MATTHEWS, J., with whom BURKE, J., joins, dissenting in part.

MATTHEWS, Justice, with whom BURKE, Justice, joins, dissenting in part.

I agree with the majority opinion except as to part III, relating to the award of custody to Samuel. With respect to that issue, I would affirm the decision of the superior court. In my view, the court's findings are sufficient to demonstrate the reasons for the court's conclusion that it was in the best interest of the child, Christopher, that Samuel be awarded custody.

### A.

I will discuss each of the reasons given by the majority opinion for its conclusion that custody must be reconsidered.

---

1. The trial court also found that Diane was "unstable," without any articulated explanation of what it meant in using such a conclusory term. Some explanation of the term in context may be helpful.

1. The finding that Diane "does not see the world as the average person sees it."

The trial court's written statement that Diane "does not see the world as the average person sees it" was also expressed in the court's oral decision, but in a more detailed context. The court said:

> And, I don't know why she didn't understand that her impact upon the trier of fact would be directly impacted by what a reasonable person would find to be her misleading the trier of fact by omission. That bears out, of course, what Dr. Cassell has said on the witness stand here and said very clearly.
>
> And, I have seen no evidence that Mrs. Lowdermilk has made any effort to deal with what I consider to be a very significant problem. I do not know how a child deals with the fact that his parent does not see the world the same as the average person sees the world in very important respects. Mrs. Lowdermilk does not see the world as the average person sees it. I expected the child allowance for that,[1] but it may be that the child buys into seeing the same as his mother sees it and I think that would be very, very serious and that is one of the most troubling aspects of this case.

There was evidence that Diane has perceptual problems. Dr. Cassell, Diane's treating psychiatrist, described Diane as having "a hysterical character disorder." He said Diane lacked insight into her condition and was unwilling to shoulder responsibility for her problems. At one point Dr. Cassell referred to "her paranoia and borderline thought disorder." Dr. Cassell said that the prognosis for one in Diane's condition was not good in the absence of insight into her condition.

Despite therapy, Diane did not improve. Dr. Cassell was asked whether Diane's apparent lack of insight would be a significant factor which the court should weigh in determining custody. In response, Dr. Cassell questioned whether such a person would serve as a good role model for chil-

dren "as they [the children] want to mature beyond adolescence themselves." Further, Dr. Cassell expressed concern that a child of such a parent might be drawn into the parent's world of conflict and blame: "If they are involved in a whole lifestyle of conflictual relationships, then the child will be a party to this." Finally, the doctor thought the physical health of a child might be affected: "And, as I testified previously with the infant son, the history of stress picked up by the child, lowering their resistance to infection and so on, all these things would be a major concern...."

Dr. Cassell was not alone in noting Diane's mental outlook. Custody Investigator Yeotis wrote:

> Investigator believes that Mrs. Lowdermilk has difficulty accepting her portion of the responsibility for the turmoil and chaos in her relationships. She appears to be unwilling or unable to perceive how her behavior impacts on others and tends to "blame" her partners when things go wrong. Although Mrs. Lowdermilk has spent considerable time in therapy with a variety of therapists, she appears to have made little progress in becoming independent and responsible for herself and her actions.

The trial court's finding that Diane "does not see the world as the average person sees it" is understandable in the context of the evidence that she suffers from a hysterical character disorder with paranoid features, lack of insight, and an unwillingness to accept personal blame. Further, in view of the above evidence, the finding is not clearly erroneous.

The trial court also related the challenged finding to the well being of the child, for it found that because of her mental outlook Diane "would therefore not be a good role model for a child." Dr. Cassell's testimony, which was explicitly accepted by the trial court, also directly reflects on Diane's parenting ability. As noted, the doctor expressed concern that a person suffering from her disorder would be a poor

1. This may be a transcription error, the court seems likely to have said "I expect the child allows for that."

role model who might, in various ways, pass on her disorder to her children. He further observed that the stressful environment that a person with such a disorder tends to create can be physically damaging to children. Thus, there is an obvious nexus between Diane's mental state and her parenting ability.

2. The finding that Diane is unstable.

In a footnote, the majority opinion mentions that the trial court also found that Diane was "unstable" without explaining what this term means. Again, in context, it is reasonably clear that this is a reference to the hysterical personality disorder from which she suffers and its various manifestations.

3. The question of domestic violence.

I do not agree with the majority that the trial court ignored the issue of spousal abuse. AS 25.24.150(c) requires the court in determining custody to consider a number of factors including "(7) any evidence of domestic violence, child abuse, or child neglect in the proposed custodial household or a history of violence between the parents." In his oral decision, the trial court demonstrated that he had considered the history of violence between the parents, finding that the injuries which Diane claimed she suffered were not inflicted intentionally. Most importantly, counsel for Diane asked the trial court to make findings "about any potential risks to the child for violence by Mr. Lowdermilk." The court, in response to this request, found that the child was not at risk from Mr. Lowdermilk. Thus, it seems plainly wrong to say that the court did not consider evidence of domestic violence.

## B.

Diane argues that the trial court's finding that she had undermined the relationship between Christopher and Samuel is clearly erroneous. The court's finding in this respect states: "The court finds that Diane Lowdermilk has undermined the child/father relationship by her conduct and the court has no confidence that this is likely to change in the future." This finding relates to one of the statutory factors which the court should consider in determining custody, that is, "the desire and ability of each parent to allow an open and loving, frequent relationship between the child and the other parent." AS 25.24.-150(c)(6).

There is ample evidence of conduct on the part of Diane which would tend to undermine the child/father relationship. For example, according to Samuel, Diane, without notice, moved to Georgia with Christopher in July of 1988. Thereafter, Samuel was in the southeastern United States twice and both times requested visitation. He testified that both times visitation was denied. When, after Diane left for Georgia, Samuel attempted to contact Christopher by telephone, an effort he would evidently make every Sunday, he would normally only be able to talk to an answering machine. He testified that these calls were never returned.

Although Samuel testified that he had an "outstanding" visit or series of visits with Christopher just prior to and during the trial, the visits were not a demonstration of Diane's desire to reunite father and son. As one example, when Samuel was visiting Christopher and Diane's other son, Jamie, at a daycare center, Diane terminated the visit by calling the police. Similarly, after another visit either immediately before or during the trial, Diane perceived that Christopher had been physically abused and called the police. The trial court found that there had been no physical abuse.

Custody Investigator Yeotis testified as an expert in child custody decision making. After extensive contact with both parties, including a two and a half day visit to Diane and Christopher in Georgia and two home visits in Alaska, she recommended strongly that Samuel be given custody of Christopher. Among her reasons for this recommendation were her "concerns regarding Mrs. Lowdermilk's ability to allow Mr. Lowdermilk to have an open and loving relationship with his son...." These concerns were based in part on indications that Diane had denied or restricted access to her older son, Jamie, to Jamie's father. They

are also based in part on Diane's request that Samuel's visitation be closely supervised; Diane wanted it to take place only at Samuel's father's home in West Virginia, and only if Samuel posted a bond.

In summary, my review of the record has convinced me that the trial court's findings concerning custody are legally and factually sufficient. Therefore, I would affirm the trial court's custody decision.