*Notice: This opinion is subject to correction before publication in the PACIFIC R`EPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| GEORGETTE S.B., | ) | |
| | ) | Supreme Court No. S-16687 |
| Appellant, | ) | |
| | ) | Superior Court No. 3AN-14-04278 CI |
| v. | ) | |
| | ) | **O P I N I O N** |
| SCOTT B., | ) | |
| | ) | No. 7319 – December 7, 2018 |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Patrick J. McKay, Judge.

Appearances: Larissa Hail and Kris O. Jensen, Law Offices of Dan Allan & Associates, Anchorage, for Appellant. Scott B., pro se, Anchorage, Appellee.

Before: Stowers, Chief Justice, Winfree, Maassen, Bolger, and Carney, Justices.

MAASSEN, Justice.

## I.     INTRODUCTION

A mother appeals from an order modifying custody, which awarded sole legal and physical custody of her three children to the father and limited her to supervised visitation pending the children's full engagement in therapy. The mother argues that the father failed to demonstrate a change in circumstances that would justify

a modification of custody and that the resulting modification was not in the children's best interests.

We conclude that the superior court did not abuse its discretion when it determined that the mother's interference with the children's therapy amounted to a change in circumstances and that the children's best interests were served by an award of sole legal and physical custody to the father while therapy took hold. We therefore affirm the court's order modifying custody.

## II. FACTS AND PROCEEDINGS

### A. Background

Georgette S.B. and Scott B.[1] married in 2002 and divorced in 2015. They have three children born during the marriage, two boys and a girl.

The superior court issued a custody order in November 2014. The court observed that "[t]he parties have had a highly acrimonious separation," but it found "that both parents express the desire to meet the children's needs and that both are capable of meeting the basic needs of the children." The court therefore ordered joint physical and legal custody, with a legal custody exception for the children's educational and therapeutic needs, on which Scott had the final say. The court ordered Scott to enroll the children in therapy and ordered both Georgette and Scott to "try to alternately attend the children's individual therapy and . . . fully cooperate and participate as requested by the individual therapists."

In July 2015 Scott filed a motion to compel Georgette to participate in the children's therapy and to modify the 2014 order to give him sole custody of the children. In October he moved to hold Georgette in contempt for failing to allow the children to participate in therapy, making disparaging remarks about him to the children, exposing

---

[1] We use pseudonyms to protect the children's privacy.

the children to litigation matters, and failing to follow the court-ordered custody calendar. The court found Georgette in contempt following a hearing. The court discussed the therapy schedule for the next few weeks and specified which parent would be taking the children to each appointment. Looking forward to the scheduled custody modification hearing in three months' time, the court stated: "If you don't keep these kids in therapy, I will do what's necessary to make sure they're in therapy. I cannot be any clearer, and I want the court record [] to reflect that I am looking directly at Ms. [S.B.] when I am saying this."

In January 2016 the court held an evidentiary hearing on Scott's modification motion. The court did not change the existing joint custody arrangement, only its day-to-day execution. The court noted its continued displeasure with Georgette's failure to support the children's therapy but said it would give the parties one more chance to cooperate with therapy and other activities, or it would be forced to award full custody to one parent.

## B. The March 2017 Custody Modification

Scott again moved to modify custody in November 2016. The court held a three-day trial the following March and heard from 21 witnesses, including the children's former therapists. The court then put its findings and conclusions on the record. The court found that all three children had "a special need for psychotherapy" but that Georgette, by her "fail[ure] to support past therapeutic involvement," had "interfered with a smooth therapeutic intervention for the children." The court found that Georgette's "confront[ational] communication style and refus[al] to accept the realities of the scope of assistance required [had] interfered with the children's schooling in the past and the children's therapy, both past and present." It found that Georgette's "lack of support for therapy was conveyed to the children through either words, actions[,] or

attitudes in such a manner that the children did not feel that they [had] to cooperate in the therapeutic process and . . . [that] disrupted the therapeutic process."

The court noted that "Denali Family Services and Counseling Solutions [were] no longer an option for these children, . . . in no small part . . . due to [Georgette's] sabotaging the therapeutic relationship." But the court found it "interesting" that the children had been more involved "when [Georgette] chose and supported" a therapist at Southcentral Foundation in December 2016, after Counseling Solutions had ceased its sessions. The therapist Georgette selected could not continue beyond four sessions because of Southcentral's eligibility criteria, and Scott was attempting to establish "another therapeutic family relationship, including wraparound services, with Anchorage Community Mental Health." But the court was concerned that Georgette did not "fully support[] these services, and there [was] already indication that [the older boy was] resistant to therapy."

The court concluded, "[r]egretfully," that the needed therapy would not "take hold" unless the children were given time to be "fully engaged in the therapeutic process" outside their mother's negative influence. It found that Scott, unlike Georgette, had "always been open to receiving professional assistance." The court awarded "both sole legal and sole physical custody of the children" to Scott and, "at least temporarily," limited Georgette to supervised contact with the children. The court stated its "intention . . . to use this period of []supervised contact between mother and the children as something of a respite to allow the children to begin to fully engage in therapy." It required Georgette to "obtain a psychological evaluation" and encouraged her to "follow any reasonable recommendations made in" that evaluation, "which will go a long way towards her regaining unsupervised and frequent contact with the children." Elaborating on this requirement in a subsequent written order, the court authorized Georgette to move "for unsupervised visitation upon providing certification from a professional versed in

-4-                                                                          7319

high-conflict parenting that [Georgette] has acquired both a clear understanding of, and intent to apply, healthy and appropriate boundaries with the children in both her communications and non-verbal cues about their father and their third-party providers."

Georgette appeals, arguing that the superior court erred in finding a substantial change in circumstances and, assuming there was such a change, abused its discretion in deciding that the children's best interests required a modification of custody and limits on her visitation.

## III.   STANDARDS OF REVIEW

"The trial court has broad discretion in determining child custody issues; resolution of those issues will be reversed 'only if, after a review of the entire record, we are convinced that the trial court abused its discretion or that the controlling factual findings made by the trial court are clearly erroneous.' "[2] This "broad discretion" applies to the determination whether there has been "a substantial change in circumstances affecting the child."[3]  When considering a child's best interests in making a custody award, a trial court abuses its discretion if it "considers improper factors, fails to consider statutorily mandated factors, or gives too much weight to some factors."[4]

## IV.   DISCUSSION

### A.   The Superior Court Did Not Abuse Its Discretion By Finding A Substantial Change In Circumstances.

The superior court determined that Georgette's continued interference with the children's therapy was a changed circumstance that allowed it to consider whether

---

[2]     *Barrett v. Alguire*, 35 P.3d 1, 5 (Alaska 2001) (quoting *Jenkins v. Handel*, 10 P.3d 586, 589 (Alaska 2000)).

[3]     *Heather W. v. Rudy R.*, 274 P.3d 478, 482 (Alaska 2012).

[4]     *William P. v. Taunya P.*, 258 P.3d 812, 814 (Alaska 2011) (quoting *Long v. Long*, 816 P.2d 145, 150 (Alaska 1991)).

to modify custody. Georgette argues that the evidence did not support this determination, though she does not appear to challenge the essential findings of fact: that the children had a special need for therapy and that her own attitude toward therapy had interfered with its success in the past.[5] We read her argument as a challenge to the court's determination that the facts, as found by the court, amounted to a substantial change in circumstances, a determination we review for abuse of discretion.[6]

The first custody order, from November 2014, noted the existence of serious conflict in the parties' home and their "highly acrimonious separation." It noted that the children had been in therapy but no longer were, although their therapist had recommended that therapy continue. The superior court specifically found at that time that Georgette's "confrontational and sometimes oppositional attitudes have interfered in meeting the children's therapeutic needs, whether directly with the professionals involved or indirectly by involving the children in the divorce issues." While finding substantial fault with both parties' parenting, the court found that it was "in the children's best interests that [Scott] be granted sole legal custody to determine the children's educational and mental health needs," and it ordered that he "re-enroll the children into therapy," that he keep Georgette advised, and that the parties "try to alternately attend the children's individual therapy and . . . fully cooperate and participate as requested by the individual therapists."

Over the next two years the superior court repeatedly admonished Georgette about her reluctance to support the children's therapy, and it warned that continued problems could result in an award of full legal custody to one parent. Scott's

---

[5] Instead, Georgette emphasizes testimony about other issues — academics and child care.

[6] *See Heather W.*, 274 P.3d at 482.

November 2016 motion for modification of custody and supporting affidavit were based on Georgette's allegedly "destructive" and "dysfunctional" behavior across a wide range of family interactions, but much of the evidence at the March 2017 trial focused on the therapy issue.

Scott called three employees of Counseling Solutions of Alaska, where he had enrolled the children in therapy from September 2015 to August 2016. The daughter's therapist testified about her interactions with the parents. She testified that Scott brought the children to therapy, remained during the sessions, informed her of what was going on at home "in terms of the kids' behavior," and left her "probably two or three voicemails per week" about the children's activities and progress. She described Scott as "very engaged and involved in the kids' therapy sessions," "open to feedback," and "communicative with us regarding the issues with the kids and things that would go on"; overall, he was "very pleasant and cooperative."

The therapist described her experience with Georgette differently. She testified that their interactions "initially . . . were very friendly and very cordial," but "as time progressed they became more adversarial." She testified that she sensed "kind of an underlying suspicion [on Georgette's part] of our intentions regarding her children." She testified that Georgette called the clinic maybe once a month; she described the calls as "not how can I do better, how can I support my children in therapy," but rather "geared toward[] . . . the subjects that had been broached, [and] when this therapy was going to be completed." There were conflicts with Georgette over scheduling, "some possible concern [on Georgette's part] regarding racial issues" (not further explained in the therapist's testimony), and whether it was appropriate for the therapist to ask the daughter about a particular conflict with her mother. The therapist testified that it became clear that Georgette "did not feel the kids should have been in counseling," and that this attitude affected the daughter's attitude as well: "[A] lot of the undercurrent of

negativity regarding counseling had started to come up with [the daughter] and I felt like actually counseling had become counterproductive for her and actually had started creating more anxiety for her to be here and to have somebody asking questions." The therapist testified that the daughter still needed counseling, because she was "going to struggle to succeed" until "the level of conflict between her parents . . . [was] resolved," but that Counseling Solutions had to "back away from treating the kids" because the "disdain," "negativity," and "anxiety" apparent in Georgette's attitude made therapy "counterproductive."

The boys' counselor at Counseling Solutions also testified. He testified that he "was impressed with [Scott] because he was punctual," "engaged in therapy," "consistent with parenting interventions," and "patient with the children," and "he communicated quite clearly about his concerns and needs." He testified that his interactions with Georgette were limited; she "complied with the formality of counseling" but was reserved and rarely volunteered information about how things were going at home. He had the impression that she did "not want to or need to participate" because the counseling was for the children. He testified that Counseling Solutions ended the boys' therapy sessions "probably for two reasons": first, "that we really were not able to help the children cope with the interpersonal stress between the parents"; and second, because "if there is no parental agreement [that] counseling is reasonable and helpful[,] counseling typically does not work all that well[,] and in this case it was a spectacular failure." He testified that the boys still needed counseling.

The third witness from Counseling Solutions was one of its owners. He testified that he got involved in the children's cases because there were "a lot of complaints and questions about policies and what we're doing and what kind of treatment the kids are getting and why it's even necessary"; these questions were "[p]rimarily from mom." He testified that his interactions with Scott "were pleasant and

respectful and cooperative." But as for Georgette, the owner testified that she questioned the motives and tactics of the children's therapists; she insisted she would not pay for "family therapy," that is, time the therapists spent talking to Scott about the children; she was unhelpful in dealing with insurance and billing issues; and "there was always some sort of problem or complaint" over scheduling. The owner testified that Georgette rejected his suggestions that she meet with the therapists, sit in on the children's sessions, and get a better understanding of "the therapeutic process." He testified that in his interactions with her she "always seemed really adversarial, really distrustful" and that the children were "picking up on" this and becoming more "shut down and withdrawn." He testified that the clinic's collective decision to terminate the children's therapy was because "it was felt that it just had become too adversarial, that there was a lack of trust"; "it was difficult to deal with [Georgette] on a consistent basis . . . and people were nervous."

This testimony from the children's counselors, in the context of the case's history, supports the superior court's conclusion that therapy was unlikely to succeed unless the children were given "a respite" from Georgette's influence to allow them "to begin to fully engage in therapy."

Georgette argues that the superior court erred by finding changed circumstances on this record because her dissatisfaction with the children's therapy preexisted the immediately preceding custody order, issued in January 2016, when the court declined to modify custody. It is true that the court characterized Georgette's attitude as a significant problem as early as the 2014 custody order, when it awarded Scott decision-making authority over the children's "mental health needs" and ordered both parties to "fully cooperate and participate [in therapy] as requested by the individual therapists." As of the March 2017 custody order, the family had lost the opportunity to continue therapy at Counseling Solutions due to Georgette's behavior, and the remaining

options appeared limited. We cannot fault the court for giving Georgette several chances to correct her behavior before deciding that the worsening situation amounted to "changed circumstances." We have recognized that while "alleged violations of court custody orders do not necessarily constitute grounds for modification, . . . they certainly can if the violations are continuous, repetitious, or egregious";[7] the evidence supports such a finding here.

Georgette argues that the children's academic performance had improved since the preceding custody order and that Scott had difficulty providing adequate child care. But the court made no findings in either of these areas, choosing to focus on the perennial issue of therapy. The court could reasonably find a change in circumstances in one important area even though other areas showed improvement or remained unchanged.[8]

Georgette also argues that she "was the only parent who could report success with enrolling the children in productive counseling." She points out that following a December 2016 hearing at which the court "expressed its concern that the children were not seeing *any* counselor" (Counseling Solutions having ended its sessions

---

[7] *Collier v. Harris*, 261 P.3d 397, 406 (Alaska 2011); *see Long*, 816 P.2d at 151 (rejecting argument that ongoing acrimony between parents could not constitute changed circumstances for modification purposes because "[w]hat is important is that the circumstances of the children *worsened* as a result of their parents' actions" (emphasis in original)).

[8] *See Kelly v. Joseph*, 46 P.3d 1014, 1017-18 (Alaska 2002) (affirming finding of changed circumstances based on interference with mother's visitation rights despite father's argument that "children were happy, healthy, well-cared for and doing better in school" with him); *cf. Jenkins v. Handel*, 10 P.3d 586, 591 (Alaska 2000) (affirming finding that mother's substantial improvement in some important areas was insufficient to justify modification when court based its decision on lack of improvement in other areas).

several months before), she unilaterally engaged a counselor at Southcentral Foundation, where the children presented well. But that counselor testified that, after four sessions between December 2016 and February 2017, she concluded that the children did not meet Southcentral's criteria for continued therapy — they were not "severely emotionally distressed." She did believe, however, that the children would benefit from "individual counseling," and that the parents, too, should have "joint counseling to learn how to co-parent . . . so that it doesn't . . . result in emotional distress for the kids." The superior court reasonably understood this evidence to show that the children were likely to benefit from therapy if only Georgette supported it.

We affirm the superior court's conclusion that Georgette's continued resistance to the children's therapy constituted a change in circumstances that justified a modification of custody.

**B.      The Superior Court Did Not Abuse Its Discretion In Weighing The Best Interests Factors.**

Having found a change in circumstances that justified a modification of custody, the superior court's next task was to consider whether modifying custody would be in the children's best interests.[9] The modification decision " 'must be guided by the best interests factors listed in AS 25.24.150(c),' which include the capability of the parents to meet the child's needs; 'the love and affection existing between the child and each parent'; stability; each parent's ability to foster a relationship between the child and the other parent . . . ; domestic violence; and substance abuse."[10] "While the 'court

---

[9]      *See* AS 25.20.110(a) ("An award of custody of a child or visitation with the child may be modified if the court determines that a change in circumstances requires the modification of the award and the modification is in the best interests of the child.").

[10]      *Judd v. Burns*, 397 P.3d 331, 339 (Alaska 2017) (quoting *Andrea C. v. Marcus K.*, 355 P.3d 521, 528 (Alaska 2015)).

-11-                                    **7319**

cannot assign disproportionate weight to particular factors while ignoring others, it has considerable discretion in determining the importance of each statutory factor in the context of a specific case and is not required to weigh the factors equally.' "[11]

In this case the superior court did not address each best interests factor individually, but it said it had "reviewed" them. It stated that "[w]hile most of the factors remain neutral, and specifically there was no question that the children have love and affection for both parents, . . . all of the children have a special need for psychotherapy and . . . mother has disrupted that need and is not capable of supporting that need at this time." It was this best interests finding that formed the basis for the court's award of sole physical and legal custody to Scott.

Georgette argues that several factors the court did not specifically address favored her. She argues that she was more capable than Scott of meeting the children's physical, emotional, mental, and social needs[12] because his late work hours left the children "worn-out and exhausted," he had trouble making sure they did their homework, and the children "were happy to see their Mother." But as explained above, it was within the superior court's broad discretion to determine that the children's "special need for psychotherapy" was their predominant need and that Georgette was "not capable of supporting that need at this time."

Georgette also argues that "[t]here was unchallenged testimony . . . that [the two boys] preferred being with their Mother."[13] But Georgette's unhealthy influence on

---

[11]     *Id.* at 339-40 (quoting *Andrea C.*, 355 P.3d at 528).

[12]     *See* AS 25. 24.150(c)(1), (2) ("In determining the best interests of the child the court shall consider (1) the physical, emotional, mental, religious, and social needs of the child; [and] (2) the capability and desire of each parent to meet these needs.").

[13]     *See* AS 25.24.150(c)(3) ("In determining the best interests of the child the
(continued...)

the children's attitudes — and particularly their openness to therapy — was a significant part of the problem the court sought to address; under these circumstances it was not unreasonable for the court to give little or no weight to the boys' preferences.

The superior court's best interests determination is sufficient for purposes of our review "if the findings provide 'a clear indication of the factors [that the court] considered important in exercising its discretion or allow us to glean from the record what considerations were involved.' "[14] We are satisfied that the superior court did not abuse its discretion when it weighed the best interests factors and assigned determinative weight to the children's special need for therapy and Georgette's lack of "the capability and desire" to meet that need.

## C. The Superior Court Did Not Abuse Its Discretion By Limiting Georgette To Only Supervised Visitation With The Children.

Finally, Georgette contends that the superior court erred by limiting her to supervised visitation pending the children's full engagement in therapy. She notes our discussion of the issue in *J.F.E. v. J.A.S.*, in which we observed "that the best interests of the child standard normally requires unrestricted visitation with the noncustodial parent" and "[t]herefore, an order requiring that visitation be supervised must be supported by findings that specify how unsupervised visitation will adversely affect the

---

[13]     (...continued)
court shall consider . . . (3) the child's preference if the child is of sufficient age and capacity to form a preference.").

[14]     *Sweeney v. Organ*, 371 P.3d 609, 612 (Alaska 2016) (alteration in original) (quoting *Rosenblum v. Perales*, 303 P.3d 500, 504 (Alaska 2013)).

child's physical, emotional, mental, religious, and social well-being and the other interests set out in AS 25.24.150."[15]

We are satisfied in this case with the superior court's explanation of the need for supervised visitation. The court directly addressed Georgette's "confront[ational] communication style and [refusal] to accept the realities of the scope of assistance required" for the children, rendering her incapable of supporting the children's "special need for psychotherapy"; the effect this had had on the children's therapy in the past; Scott's current attempt to "establish[] another therapeutic . . . relationship" with Anchorage Community Mental Health, one of the few remaining options; the court's fear that Georgette would "sabotage" this relationship as well; and the court's reluctant conclusion that limiting Georgette's negative influence on the children "at least temporarily, . . . so that the therapy can take hold," was the only workable option.

We have emphasized our preference "that a court ordering supervised visitation also specify a plan by which unsupervised visitation can be achieved."[16] The superior court addressed this issue as well, advising Georgette that she could move to lift the visitation restrictions "upon providing certification from a professional versed in high-conflict parenting that [she] has acquired both a clear understanding of, and intent to apply, healthy and appropriate boundaries with the children in both her communications and non-verbal cues about their father and their third-party providers."

---

[15]     930 P.2d 409, 413-14 (Alaska 1996).

[16]     *Monette v. Hoff*, 958 P.2d 434, 437 (Alaska 1998).

We have affirmed such instructions in the past;[17] the superior court did not abuse its discretion by imposing them in this case.

## V.    CONCLUSION

We AFFIRM the superior court's order modifying custody.

[17]    *See Matthew P. v. Gail S.*, 354 P.3d 1044, 1050 (Alaska 2015) (finding no abuse of discretion when superior court allowed father to regain unsupervised visitation if he "engage[d] with a therapist and show[ed] [the court] . . . that in fact he . . . is getting or has gotten better").