NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| CHARLES SMITH, ) | |
| ) | Supreme Court No. S-18542 |
| Appellant, ) | |
| ) | Superior Court No. 3AN-21-04057 CI |
| v. ) | |
| ) | MEMORANDUM OPINION |
| EVELYN SMITH, ) | AND JUDGMENT* |
| ) | |
| Appellee. ) | No. 2011 – February 7, 2024 |
| ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Peter R. Ramgren, Judge.

Appearances: Susan Orlansky, Reeves Amodio LLC, Anchorage, for Appellant. Jimmy E. White, Hughes White Colbo & Tervooren, LLC, Anchorage, for Appellee.

Before: Maassen, Chief Justice, and Carney, Borghesan, Henderson, and Pate, Justices.

# I.    INTRODUCTION

A divorcing couple litigated numerous disagreements regarding both legal and physical custody of their three children and the division of their property. Citing limitations in the father's abilities to make decisions about and to care for the children, the superior court granted the mother "primary" legal custody, giving her final decision-making authority in the event of future disagreements. It also required the father to

---

\*    Entered under Alaska Appellate Rule 214.

retain a full-time nanny during his custodial time, due to concerns for the children's safety. The father appeals, arguing that the court should have granted the parents joint legal custody, and contending that it was an abuse of discretion for the court to order that he retain a full-time nanny during the nighttime portions of his time with the children. The father also contests the superior court's valuation of household items contained in one of the marital properties.

We affirm the superior court as to all three issues.

## II.  FACTS AND PROCEEDINGS

### A.  Facts

#### 1.  The Smith family

Charles and Evelyn Smith[1] divorced in June 2022. Evelyn is an oncologist and co-owner of a medical practice. Charles was a stay-at-home parent for most of the marriage. He also recently began consulting for two technology companies, in which the parties held an estimated $23-37 million in stocks.

Charles and Evelyn owned two homes: a primary home in Anchorage and a vacation home in Costa Rica sometimes called El Nido, which translates to "The Nest". They used El Nido both for their own vacations and as a rental income property.

The parties have three minor children. At the time of trial, each of the children had been diagnosed with one or more mental health issues: Mary (age 14) had ADHD and generalized anxiety; Zane (age 11) had ADHD; and Martha (age 7) was diagnosed with an adjustment disorder with mixed emotional features. The Smith family has received ongoing care from a myriad of mental health professionals and childcare assistants. Between them, they have a family therapist, individual therapists for each parent and each of the three children, a couples therapist, and an in-home

---

[1]      The superior court ordered the entire trial court file confidential; we thus use pseudonyms for the parties and their children.

behavior specialist to provide childcare assistance and day-to-day behavioral interventions.

Charles was diagnosed with Parkinson's disease in approximately 2011 or 2012. Some of the parties' disagreements related to custody have centered on symptoms that Charles experiences due to his condition or treatment he has undergone, and whether those symptoms impact his ability to care for the children. The parties disagree about the extent of Charles's physical and cognitive symptoms, the impact of those symptoms on his ability to care for the children, and the extent to which he struggles with aspects of caring for the children regardless of his medical condition.

B. Proceedings

1. Initial proceedings

Charles petitioned for divorce in January 2021. When Evelyn answered and counterclaimed, she sought an equitable property division, along with joint legal custody and primary physical custody of the three children. Near the outset of the litigation, the parties agreed to retain a private custody investigator to conduct a custody investigation and to provide recommendations regarding both interim and longer term legal and physical custody of the children. The superior court thereafter issued an order appointing the parties' agreed-upon custody investigator.

Ultimately Charles and Evelyn were able to reach an interim custody agreement that was in line with recommendations made by the custody investigator. Among other terms, Charles and Evelyn agreed that, for the interim, they would exercise joint legal custody and shared physical custody of the children, with several rules in place. In accord with the recommendations of the custody investigator, the parties agreed that another adult would be present with Charles during his custodial time while the children were awake; Evelyn would arrange childcare and therapy appointments to occur during her custodial time; Charles's driving would be monitored in real time through a particular program; a civil no-contact order would be entered

relative to the parties' residences; and the parties' communication would be limited and would abide by certain requirements.

The custody investigator further recommended that both parents undergo a forensic psychological evaluation by an agreed-upon psychologist to assess their respective parenting abilities and psychological conditions. The parties complied with that recommendation.

### 2. Trial

The parties' divorce trial spanned several days between November 2021 and January 2022. Among the evidence the court considered was testimony by both the custody investigator and the psychologist that performed the parents' forensic psychological evaluations. The court heard testimony about and admitted the forensic psychological evaluations, as well as the custody investigator's interim and final reports.

The psychologist concluded that Evelyn "presented herself as able to cope and manage the tasks of her daily life." She "presented herself as competent to parent all three of her children," though she "identified her relationship with [Charles] and problems communicating with him as having a significant negative impact upon her ability to parent [one of the children]." The psychologist determined that Evelyn did not have any psychological disorders that would impact her capacity to parent or present any risk of abuse or neglect to the children. Indeed, the psychologist noted that Evelyn's conflicts with Charles arose from her view that he was unable to follow agreements in their life, and this constituted a major source of stress for Evelyn.

The psychologist opined that Charles meanwhile struggled with a variety of issues that hampered his ability to parent. She observed that Charles had significant cognitive, interpersonal, and emotional challenges, including "significant problems with executive functioning and mood management that could impact his ability to parent." The psychologist explained that although Charles "wants to be a good father and wants the best for his children," his "problems with executive functioning and

impulse management can present a risk of emotional and physical harm to his children." She further noted that these difficulties are more "grave and potentially dangerous . . . in a parenting role with three children with mental health issues." The psychologist concluded that Charles's challenges, paired with his "lack of awareness of his limitations and [] poor judgment[,] can put his children at risk" of neglect, and that he is "likely to underestimate and not see what risk he presents to his children." The psychologist was not able to determine whether Charles's difficulties were related to his Parkinson's disease.

The psychologist further noted that Charles demonstrated difficulty in parenting jointly with Evelyn, displaying anger and aggression, deflecting his own issues, and frequently violating the boundaries on communication established by both Evelyn and the court. The psychologist opined that Charles's "difficulty understanding and following a court order seems to be in part due to his problems with executive functioning, as well as his dislike of being told what to do."

The court determined that the psychologist's assessment of Charles was generally confirmed by other medical and mental health professionals that treated or interacted with him. One notable exception was Charles's primary neurologist, who testified that Charles was "quite functional motorically and cognitively." He noted for someone with Parkinson's disease Charles "does extremely well" and he shows "good judgment." But the neurologist had only met with Charles for a total of about 40 to 60 minutes over two years.

In addition, the custody investigator reported to the court on her investigation and interaction with the family, and made recommendations related to custody, several of which involved limiting or ameliorating Charles's behaviors. Her recommendations included that the parties consult one another and attempt jointly to make important decisions for the children, but that Evelyn have decision-making authority in the event of disagreement. She recommended that Evelyn have primary physical custody of the children, with the children living with Evelyn during the school

weeks and living with Charles during three out of every four weekends. Finally she recommended that Charles have a full-time professional with him throughout his custodial time with the children, and that a parenting coordinator be appointed to assist the parties with communication.

Related to property the court heard both lay and expert testimony and admitted expert reports regarding contested property issues. Relevant to this appeal, the court heard from a Costa Rican property evaluator retained by Evelyn. This property evaluator had prepared a report itemizing El Nido's contents in anticipation of the property division, and testified at trial regarding her evaluation and report. The property evaluator had worked in Costa Rica for 19 years in forensic and internal audit departments and had been performing similar types of evaluations throughout that time. She provided detailed information regarding her methodology for inventorying and appraising the contents of the household, including the internal audit standards she applied. She valued all household items together at $101,855.80.

Charles disagreed with the expert's appraisal and offered his own estimate of the garage sale values of the household items at around $21,700. Charles offered no additional basis to support his estimate other than testimony that he excluded household items with a value of less than $100. He also provided testimony that he heard from their property manager that Costa Rican homes are sold with their contents and that there is no second-hand market for household goods.

After trial concluded on January 11, an incident took place that involved Charles yelling at and physically harming one of the children by slamming open a door into her face after apparently being unable to disengage from conflict; Evelyn moved to reopen evidence based on the incident. The court agreed. It ordered the custody investigator to investigate and update her report, and heard additional argument related to the incident.

Ultimately, the superior court issued a divorce decree with findings of fact and conclusions of law addressing both property and custody.

### 3. Superior court's order
#### a. Custody

The court first addressed the custody issues, making findings about each of the statutory best interest factors. While the court's findings regarding many of the best interest factors did not particularly favor one parent or the other, its findings related to each parent's capability and desire to meet the children's needs were decisive. The court found that "[Evelyn] is a capable parent." It noted she has made mistakes like any other parent, some of which were testified to at length during the trial, but that she was willing and able to meet the children's needs, including their mental health needs.

On the other hand, while not doubting Charles's desire to care for his children, the court questioned "his ability to do so." The court cited at length Charles's concerning "judgement, impulsivity, and ability to accurately process information." The court noted the psychologist's observation that "[Charles] displayed a lack of awareness and a hyperinflated self-expression of his ability to function." It cited incidents in which Charles's limited executive functioning and other cognitive issues interfered with his parenting. The court considered the conflicting reports from the various experts involved in the case, giving less weight to professionals who had limited interactions with Charles over the years and more weight to the evidence from the custody investigator, psychologist, and one of the family therapists who had spent more time with Charles, including with his family. It concluded: "Whatever the cause, his parenting skills are lacking and regularly interfere with and run contrary to his children's best interest. Specifically, his ability to meet their emotional and mental health needs is compromised by his inability to meet his own emotional and mental health needs."

The court awarded modified joint legal custody, which it described as giving "primary" legal custody to Evelyn. The court ordered that the "parents shall attempt to share responsibility for making major decisions affecting the children's welfare, and . . . meaningfully communicate, negotiate, and cooperate in the process,"

but that Evelyn held final authority in case of unresolvable disagreements. The court explained that it awarded primary custody, not sole custody, because it would require that "the parties communicate with each other regarding major decisions." It also noted that Charles's "input is valuable and will benefit the interest of the children." The court ordered Charles and Evelyn to employ a parenting coordinator "to assist in their communication and co-parenting," given the parties' history of "poor communication and strained coordination."

The court also awarded shared physical custody, subject to a number of conditions. Among the conditions was that a "full-time professional nanny/housekeeper be present in [Charles's] home during all of his custodial time." The court set this condition because of "[Charles's] demonstrated lack of impulse control[, which] has the potential to place the children in danger of physical harm," and because of the potential emotional harm to the children that may result from and has resulted from "[Charles's] explosive anger." This nanny would reside with the children in both homes consistent with the children's custody schedule. The parties would split the cost of the nanny, who would be informed of Charles's Parkinson's disease and "any special accommodations . . . beyond the expected duties of a nanny" and who would be available to the parenting coordinator for questions and observations if necessary.

### b.    Property division

The superior court then allocated marital property. Relevant to this appeal, the court noted that the parties agreed to the value of El Nido as an income-producing property. Both Charles and Evelyn requested to retain El Nido. The court awarded El Nido to Charles, noting that while Evelyn had income from her oncology practice, Charles was unemployed and may be unable to work "in the relatively near future" due to the progression of his Parkinson's disease. The court noted that the parties disagreed on the value of the household contents. The court credited the analysis of Evelyn's retained professional evaluator as accurately reflecting market value of the

household items in El Nido, and adopted her valuation of the household contents at $101,856.00.

### 4. Evelyn's motion for reconsideration and Charles's opposition

Evelyn moved for reconsideration and clarification on issues related to the custody schedule, legal custody, the nanny requirement, travel, and some errors in the property division spreadsheet.

At the reconsideration hearing, the two custody issues on appeal here arose and were discussed at length. Considering the legal custody issue, the court characterized its decision to award Evelyn "primary" rather than sole legal custody as "a little bit unorthodox." It acknowledged the significant difficulties in the parties' communication with each other, but emphasized the importance of having both parties provide input in making important decisions regarding the children. The court therefore maintained its order on legal custody.

Turning next to the order for a full-time nanny, the court reconsidered its original order, removing the condition during the time that the children would be with Evelyn but maintaining the condition for the time that the children would be with Charles. The court reasoned that the condition was based on concerns regarding Charles's ability to parent the children safely and consistently during his time with them. The court did not have the same concerns regarding Evelyn. To the extent that Charles experienced logistical difficulties related to this condition, the parties agreed that the parenting coordinator could determine these "noncustodial issues."

## III. STANDARD OF REVIEW

"The trial court has broad discretion in determining child custody issues."[2] Child custody determinations "will be reversed 'only if, after a review of the entire

---

[2]     *Georgette S.B. v. Scott B.*, 433 P.3d 1165, 1168 (Alaska 2018).

record, we are convinced that the trial court abused its discretion or that the controlling factual findings made by the trial court are clearly erroneous.' "[3]

The valuation of assets "is a factual determination that we review for clear error"[4] and reverse "only when we are left with a definite and firm conviction based on the entire record that a mistake has been made."[5] But whether the superior court "applied the correct legal rule" when valuing marital property is a question of law that we review using our independent judgment.[6]

## IV. DISCUSSION

### A. The Superior Court Did Not Abuse Its Discretion In Deciding Either Legal Or Physical Custody.

Charles challenges two aspects of the superior court's custody orders: the court's award of "primary" legal custody to Evelyn and the requirement that he have a nanny present during the overnight portions of his custodial time, when the children would be sleeping. Considering the best interests of the children and the record as a whole, we conclude that the superior court's decisions regarding both legal and physical custody were within its broad discretion, and we affirm both.

---

[3]    *Id.* (quoting *Barrett v. Alguire*, 35 P.3d 1, 5 (Alaska 2001)); *see also Chesser-Witmer v. Chesser*, 117 P.3d 711, 715 (Alaska 2005) (quoting *Hamilton v. Hamilton*, 42 P.3d 1107, 1111 (Alaska 2002)).

[4]    *Beals v. Beals*, 303 P.3d 453, 459 (Alaska 2013).

[5]    *Morris v. Morris*, 506 P.3d 8, 13 (Alaska 2022) (quoting *Pasley v. Pasley*, 442 P.3d 738, 744 (Alaska 2019)).

[6]    *See Pasley*, 442 P.3d at 744 (citing *Beals*, 303 P.3d at 459).

### 1. The superior court did not abuse its discretion in awarding Charles and Evelyn modified joint legal custody.

First, we observe no abuse of discretion in the court's order that Charles and Evelyn exercise joint legal custody, with Evelyn acting as the final decision-maker in the event of disagreement.[7]

The superior court "determine[s] custody in accordance with the best interests of the child[ren]."[8] In particular, the court considers statutory factors to analyze what custody arrangement meets the best interests of *the children*, not the parents.[9] When a custody investigator has been appointed, the court should treat the custody investigator's testimony "in the same manner as testimony presented by other witnesses."[10] The " 'court may reject a custody investigator's recommendations' and carry out a sound analysis that relies on other evidence."[11]

Charles argues the superior court abused its discretion by granting Evelyn the deciding vote in the event of conflict. He urges that the court-appointed parenting

---

[7]      "Primary" legal custody is not a term supported by Alaska statute. *See* AS 25.24.150. For clarity and consistency, we suggest that the proper term is "joint legal custody," modified to name a final decision-maker in instances of conflict, and we discourage creating other terms. *See id.* But we find that here, the unclear phrasing alone does not amount to an abuse of discretion because the superior court clearly articulated that its legal custody ruling was "modified joint legal custody requiring that the parties communicate with each other regarding major decisions" and Evelyn holding final decision-making authority.

[8]      AS 25.24.150(c).

[9]      *Id.* AS 25.24.150(c) provides nine factors the court must consider to determine the best interests of the children. AS 25.24.150(d) provides that "[i]n awarding custody the court may consider only those facts that directly affect the well-being of the child."

[10]      *Ebertz v. Ebertz*, 113 P.3d 643, 647 (Alaska 2005) (citing *State v. Phillips*, 470 P.2d 266, 272 (Alaska 1970)).

[11]      *Rego v. Rego*, 259 P.3d 447, 460 (Alaska 2011) (quoting *Ebertz*, 113 P.3d at 647).

coordinator's involvement as a "key part of the custody arrangement," with "substantial authority to resolve disputes," removed the need for one parent to be a designated final decision-maker.

We reject this argument. The superior court's order makes clear that it did not appoint the parenting coordinator to ensure the high-conflict parents could retain equal footing in significant custody decisions. Rather, the appointment served in the best interests of the children because the "parties' history of poor communication and strained coordination warrant[ed] the assistance of a parenting coordinator." Moreover, the court did not give the parenting coordinator authority over legal custody decisions. Instead, the court focused the parenting coordinator's role on assisting the parties with co-parenting and communication. Thus this role would only aid, not supplant, the parents' "responsibility for making major decisions affecting the children's welfare."

Further, we conclude that the superior court's modification of joint legal custody was well supported here. Charles correctly notes the legislative preference for joint legal custody.[12] He also notes that "some history of disagreement and difficult communication does not justify denying joint custody."[13] But the superior court has "broad discretion in determining custody awards 'so long as the determination is in the

---

[12]    Charles cites ch. 88, § 1(a) SLA 1982 ("The legislature finds that . . . it is in the public interest to encourage parent's to share the rights and responsibilities of child rearing . . . . [I]t is the intent of the legislature that both parents have the opportunity to guide and nurture their child and to meet the needs of the child on an equal footing beyond the considerations of support or actual custody.").

[13]    *See Bell v. Bell*, 794 P.2d 97, 99-100 (Alaska 1990) (concluding one conflict between a couple does not justify denying joint custody).

child's best interests.' "[14] And the legislative preference for joint custody is limited by the best-interests analysis.[15]

Charles also attempts to distinguish our decision in *Ronny M. v. Nannette H.* that affirmed a superior court's order of modified joint legal custody, and suggests that such an order is appropriate under only very narrow circumstances.[16] Charles contends that "the kind of modified joint legal custody that the superior court selected here" was upheld in *Ronny M.* because the parents in that case "resided thousands of miles apart" and because the father was not very involved in the children's lives. In contrast he emphasized that both he and Evelyn "have been actively involved with the children throughout their lives." *Ronny M.* involved "no objective professional" whereas here, he argues that the parenting coordinator is an "appropriate, objective professional to resolve disputes." Charles contends the presence of the parenting coordinator obviates the need for one parent to have final say.

But *Ronny M.* is not as restricted as Charles argues, and it does not limit modified joint legal custody in the way that he advocates. There, as here, the court modified joint custody because the parents had extreme difficulties communicating, largely due to one parent refusing to communicate with the other.[17] Indeed we have often identified parents' communication as important in deciding whether to uphold

---

**14** *Stephanie F. v. George C.*, 270 P.3d 737, 745 (Alaska 2012) (quoting *Misyura v. Misyura*, 242 P.3d 1037, 1039 (Alaska 2010)).

**15** *Red Elk v. McBride*, 344 P.3d 818, 823 (Alaska 2015) ("Although there is a preference for joint legal custody, it may only be awarded if it is in the best interest of the child." (first citing *Farrell v. Farrell*, 819 P.2d 896, 898 n. 1 (Alaska 1991); and then citing AS 25.20.060(c))).

**16** 303 P.3d 392 (Alaska 2013).

**17** *See id* at 405.

joint legal custody. We "have held [that] 'joint legal custody is only appropriate when the parents can cooperate and communicate in the child's best interest.' "[18]

Given the voluminous record of the parents' significant conflict, we see no abuse of discretion in the court's modification of joint legal custody. As Evelyn correctly notes, the court's decision to modify legal custody was based on extensive evidence of Charles and Evelyn's high-conflict relationship impairing their ability to communicate and Charles's "increasing inability or unwillingness" to communicate with Evelyn. Facts before the court included direct observations and primary reports of Charles's diminished ability to communicate, his choices to blame the children instead of reflecting on his parenting style, his reluctance to acknowledge the children's needs, his resistance to agreed-upon court orders, his increasingly abusive communication style, and his repeated difficulty with following directions and working towards compromise with Evelyn. The court "share[d] the concerns of the custody investigator that [Charles's] diminished executive functioning and impulse control impair his ability to appropriately and effectively communicate with [Evelyn]" and that "[Charles] is reluctant to fully acknowledge the children's needs." The court also found that Charles's parenting approach was not in the children's best interests based on his patterns of resisting recommendations and blaming the children for his own shortcomings, which the court found "reflects poorly on his ability to make parenting decisions generally."

Given the parents' history of conflict, and difficulties with communication and cooperation, the superior court did not abuse its discretion in modifying joint legal custody.

---

   **18**    *Collier v. Harris*, 261 P.3d 397, 405 (Alaska 2011) (quoting *Jaymot v. Skillings-Donat*, 216 P.3d 534, 540 (Alaska 2009)); *Farrell v. Farrell*, 819 P.2d 896, 899 (Alaska 1991).

**2.** **The superior court did not abuse its discretion in requiring an overnight nanny during Charles's custodial time.**

Charles also challenges the superior court's order that he have a full-time nanny in his home during his custody time, including when the children are asleep. Notably he does not challenge the nanny condition itself, just its application overnight.[19] Though admittedly unusual, we conclude that the overnight nanny condition is well supported under these circumstances and that the superior court did not abuse its broad discretion on the record before it.

Charles argues that there is "no sound basis" for the overnight nanny condition and that the superior court did not "properly consider[] the best interest[s] of the children" in establishing this requirement. He urges that "[t]he court should not curtail a parent's choices with restrictions that are not necessary to protect the children's best interests."[20] He argues that the children are not so young that they need night-time parental attention and that concerns about the children's safety in an emergency due to his periodic immobility are purely speculative.

Charles's argument mischaracterizes the facts and concerns that led the court to impose the condition. The court ordered the requirement because of ample

---

[19] Charles describes the "real-world implications" of the order as "draconian," a threat to his custodial time, and unnecessarily costly. But he does not argue — and the record does not suggest — that hiring a full-time live-in nanny is truly impracticable for him. If Charles seeks to raise impracticability, we note it could be done later in a motion to modify.

[20] Charles cites multiple cases relating to restrictions on parental conduct in child custody orders. *Green v. Parks*, 338 P.3d 312, 315-16 (Alaska 2014) (reversing father's alcohol restriction in custodial time not in children's best interests); *Mariscal v. Watkins*, 914 P.2d 219, 222 (Alaska 1996) (reversing restriction on mother's alcohol consumption and sexual behavior not in child's best interests); *Jessie R. v. Timothy F.*, No. S–16154, 2017 WL 1291151, at *4 (Alaska Apr. 5, 2017) (employing best interests standard when considering restriction on parent's use of corporal punishment, while not determining whether best interests standard should be the only standard in deciding restrictions on parents' behaviors during custodial time). None are applicable here.

evidence showing "the seeming decline in [Charles's] executive functioning and impulse control." The nanny requirement was primarily supported by the court's findings related to the parents' abilities to meet the children's physical and emotional needs. The court found that "[Charles's] ability to meet the . . . needs of his children is compromised and he is not capable of doing so without assistance." The court's findings relied on the psychologist's concerns about the "impulsive quality [of] some of [Charles's] behaviors and decision-making," his tendency toward aggression, the risk of physical and emotional harm to his children, and concerns regarding Charles's "ability to meet their emotional and mental health needs."

While the court did not expressly state that this concern existed at night, it did order a full-time, live-in nanny instead of daytime assistance to aid Charles in caring for his children, including at night. The court also identified unique issues supporting the order. First the court found that the two older children should not be left responsible to "largely protect themselves and their little sister from any impulsive decisions by [Charles]" at any time. Second the court found "[Charles] is unable to control his anger and that these outbursts will likely continue." Therefore it was in the best interests of the children to require Charles to get help in caring for them. Although none of the incidents that the court addressed took place at night, that does not mitigate the court's weighty concerns that Charles's difficulties with capacity, judgment, and emotional regulation which could affect the children at night.

Taken together these difficult circumstances support the court's unusual requirement of an overnight nanny. The court found "that with the support of a fulltime, in-home, professional nanny, [Charles] is capable of meeting their needs and maintaining and advancing the mostly positive relationship he now enjoys with his children." We emphasize that the overnight nanny condition allowed the court to address its concerns while maximizing Charles's time with his children.

Given its thorough consideration of the best interests factors, we conclude that the court did not abuse its discretion in requiring Charles to have a nanny in the home during his custodial time, including during the night.

**B. The Superior Court Did Not Err In Accepting The Expert Valuation Of The Contents Of The Costa Rica House.**

Charles argues that the court erred in accepting Evelyn's expert's valuation of the contents of El Nido rather than Charles's estimated resale values. Courts use a three-step process to divide property. First, the court determines what property there is to divide.[21] Second, the court values the property.[22] And third, the court considers numerous factors in order to divide the property equitably.[23]

Charles argues that the superior court erred by accepting the expert's $101,856.00 valuation of the Costa Rica personal property because he contends that the expert failed to evaluate the fair market value of the property and instead relied upon the replacement cost of items. Charles argues Alaska law requires that marital property must be valued "at the time of the division of the estate," and that personal property must be valued at its " 'fair market value' at the time of trial and not its original cost or replacement cost."[24] He argues that even if Costa Rica has no "culture of selling used property," the expert's property valuation method is disallowed under Alaska law.

---

[21] *Chotiner v. Chotiner*, 829 P.2d 829, 831 (Alaska 1992).

[22] *Beals v. Beals*, 303 P.3d 453, 458 (Alaska 2013).

[23] *See Merrill v. Merrill*, 368 P.2d 546, 547-48, 548 n.4 (Alaska 1962); AS 25.24.160(a)(4) (listing factors that must be considered in division of marital property).

[24] Charles cites to multiple cases to support his argument. *See e.g.*, *Pasley v. Pasley*, 442 P.3d 738, 753 (Alaska 2019); *Stevens v. Stevens*, 265 P.3d 279, 287 n.41 (Alaska 2011); *Doyle v. Doyle*, 815 P.2d 366, 369-70 (Alaska 1991).

But Alaska law is not as rigid as Charles suggests. Property should be valued "as close as practicable to the date of trial,"[25] and in determining fair market value, "an asset need not be marketable if the court can objectively determine that it has value to its owner."[26] The court should use the best evidence in the record of the market value to determine an item's value.[27] We have previously stated that "where there is no better evidence in the record, the court does not err by valuing an asset at its original cost."[28]

At trial both sides questioned the property evaluator about her appraisal methods and the appropriateness and availability of "garage sale" values in the Costa Rican market. The appraiser described her methodology, which included visiting the property and "us[ing] a market value method to evaluate all the items." Evelyn's lawyer questioned her directly about whether she evaluated the property under the Alaska standard for "fair market value" of a product, and she testified that she believed she provided the "fair market value" for each of the items in her report. Then she described her methods for determining fair market value, including looking up similar items with similar characteristics sold through a variety of platforms, looking at whether stores in Costa Rica carried similar items, and then looking beyond at "different outside stores." On cross-examination she testified that in Costa Rica there is not a strong culture of garage sales and that used items are given away or donated instead of resold. But she

---

[25] *Pasley*, 442 P.3d at 753.

[26] *Martin v. Martin*, 52 P.3d 724, 731 (Alaska 2002).

[27] *See Tomal v. Anderson*, 426 P.3d 915, 926 (Alaska 2018) (citing *Doyle*, 815 P.2d at 369) (finding clear error when court valued excavator at $1000 when "best fair market value evidence in the record" was an offer to purchase it for $6000, despite the fact excavator was originally purchased for $1000 and needed significant repairs before resale).

[28] *Benjamin S. v. Stephenie S.*, No. S-16007, 2018 WL 669169, at *6 (Alaska Jan. 31, 2018) (quoting 2 BRETT R. TURNER, EQUITABLE DISTRIBUTION OF PROPERTY § 7:10 (3d ed. 2016)).

noted that "[h]ere in Costa Rica, if you show the house with all the items inside, the items will be added." As a result she reaffirmed that her aggregate estimate of around $101,000 represented the value of the household items that she would expect to be added to the property and home value if the home were being sold as is.

The court considered both the evaluator's expert appraisal and Charles's personal estimate, proffered without additional evidence to support it.[29] The court found the evaluator to be credible, and more specifically found her appraisal more accurate and reliable than Charles's estimate.[30]

Overall, the court did not clearly err by accepting Evelyn's expert's valuation of the contents of El Nido in the absence of any better evidence.[31] The expert, well-versed in property valuation within the market at issue and deemed credible by the court, presented a detailed explanation for her determinations of value. And while at times she seemed to rely on replacement value, she testified that the contents of El Nido would sell at her identified value if sold with the home. Though "garage sale" value

---

[29] Charles's exclusion of items under $100 appears to be based on Alaska Civil Rule 26.1 which requires disclosure of all property with value above $100 to the other spouse. This procedural rule is not a limit on what property the court can value, but rather is a discovery tool to ensure each party can determine the scope of the marital estate. *See Olivera v. Rude-Olivera*, 411 P.3d 587, 591-92 (Alaska 2018) (citing Alaska R. Civ. P. 26.1).

[30] We further note that Evelyn requested that the superior court award El Nido and its contents to her, with the contents valued in accord with her expert's testimony. This distinguishes this case from circumstances in which parties advocate for certain valuations of property to be awarded to the other spouse and thus may have some incentive to advocate for a higher valuation.

[31] *See* 2 BRETT R. TURNER, EQUITABLE DISTRIBUTION OF PROPERTY, § 7:10 (4th ed. 2023) ("[W]here there is no better evidence in the record, the court does not err by valuing an asset at its original cost."). Charles is correct that his estimate is evidence, but here the court determined it was not better than the professional estimate. *See Gregory v. Padilla*, 379 P.2d 951, 953 (Alaska 1963).

remains the predominantly accepted measure of fair market value, we see no error or clear error in the court's acceptance of Evelyn's expert's valuation in this context.

## V.    CONCLUSION

We AFFIRM the superior court's orders related to legal and physical custody of the children, as well as valuation of the property.